Arthur CUTHAIR, Helen Munoz, Angelia Badback, Joselina M. Lopez, Julian L. Lopez, Marjorie Soto, Jocelyn Dutchie and Gloria Tom, Plaintiffs,

v.

MONTEZUMA–CORTEZ, COLORADO SCHOOL DISTRICT NO. RE–1; Montezuma–Cortez School District No. RE–1 Board of Education; Walter Henes, Robert Cruzan, Nick Lewis, William Vicary, Carroll Johnson, Sidney Snyder and Allen Witmer, President and Directors respectively of the Montezuma–Cortez School District No. RE–1, Defendants.

Civil Action No. 89–S–964.

United States District Court, D. Colorado.

June 11, 1998.

Tim LaFrance, Durango, CO, Laughlin McDonald, American Civil Liberties Union Foundation, Inc., Atlanta, GA, for Plaintiffs.

Kenneth A. DeLay, Christopher E. Gdowski, Miller, DeLay & Crabb, P.C., Westminster, CO, for Defendants.

MEMORANDUM OPINION AND ORDER

SPARR, District Judge.

THIS MATTER came before the Court for trial on September 29—October 6, 1997. The Court having heard and reviewed the evidence, arguments, and applicable law, issues the following Memorandum Opinion and Order.

### BACKGROUND

The Plaintiffs bring two claims for violation of Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973. The second claim also alleges violations of the First, Thirteenth, Fourteenth and Fifteenth Amendments to the Constitution of the United States.

Plaintiffs are Native Americans and members of the Ute Mountain Ute Tribe or the Southern Ute Tribe [1] residing in the Montezuma–Cortez School District No. RE–1 in Montezuma County, Colorado. Plaintiffs are all residents of the Ute Mountain Ute Indian Reservation lying within the School District. The Colorado portion of the reservation lies entirely within Director District D of the School District. Towaoc, the primary settlement area on the Ute Mountain Ute Reservation is physically isolated from the town of Cortez in Montezuma County and is located approximately 13 miles south of the Cortez city limits.

The Defendants are the School District and the seven members of the School District Board of Education. The members of the Board of Education are sued in their official capacities only. The terms of office for members of the Board of Education are staggered and are for four years each. Elections for the Board of Education are nonpartisan. Board elections are held as a part of the general state and local elections in odd numbered years. At the time the complaint was filed, the members of the Board were elected at-large from residential, or 'Director' districts. The candidate in each Director District who received the most votes was elected. There was no requirement that the winning candidate receive a majority vote.

The State of Colorado has had at-large school elections by statute since 1919. The election system at issue here was modified for the 1991 and 1993 Board elections by the terms of a consent decree previously entered by the Court in this case. (The consent decree was entered by a previous judge who presided over this case). Under the terms of the consent decree, voting for the six Director Districts, exclusive of Director District D, was by the at-large voting method. The representative for Director District D was elected only by the residents of Director District D.

During the 1989, 1991, and 1993 elections, Director District D consisted of two precincts, Precinct 6 and Precinct 7. Precinct 6 consisted solely of the part of the Ute Mountain Ute Reservation which is in Colorado.

Plaintiffs brought suit in 1989 alleging that the at-large method of electing the Board of Education diluted Native American voting strength in violation of § 2 of the Voting Rights Act, 42 U.S.C. § 1973, and the First, Thirteenth, Fourteenth, and Fifteenth Amendments to the Constitution of the United States. The consent decree was entered on April 9, 1990, in a settlement of Plaintiffs' claims, and established a majority Native American Director District D for the School District Board of Education for 1991 and 1993 elections. The 1991 contest was a special mid-term election created by the consent decree. Residents of Director District D were not permitted to vote on the other School Board Director contests pursuant to the terms of the consent decree. The remaining residents of the School District continued to vote at-large, but were not permitted to vote on the contest in Director District D.

The consent decree provided further that if no Native American candidate, or candidate endorsed by the Ute Mountain Ute Tribal Council, was elected to the School Board for District D in either the 1991 special or the 1993 regular elections, Defendants would have a year within which to seek a declaratory judgment from this Court allowing them

---

1. The Court notes that the Complaint states that Plaintiff Dutchie is a member of the Southern Ute Indian Tribe.

to restore the pre-existing at-large method of elections for the entire School District.

Janice Colorow, a resident of the reservation, ran for the Board of Education from District D in the 1991 special election and was defeated by the incumbent, Alan Whitmer. Yvonne M. House, a resident of the Ute Mountain Ute Indian Reservation, filed a notice of intent to be a candidate from District D for the 1993 election, but the notice was rejected because of insufficient signatures. She, however, qualified as a write-in candidate shortly before the 1993 election but was defeated by the incumbent, Alan Whitmer.

In October 1994, the Defendants filed a motion pursuant to the consent decree to allow the resumption of at-large voting for the Board of Education. Upon reopening of the case after the consent decree, the matter was assigned to this Judge. Plaintiffs filed an opposition to the motion on the grounds that the proposed change would be retrogressive under § 5. Following a hearing, this Court determined that the consent decree was unenforceable because the Defendants had not admitted liability nor had the Court made a finding that the at-large system of elections violated either § 2 or the Constitution. Under those circumstances, the Court ordered a trial on the issues.

## HISTORY OF DISCRIMINATION AGAINST NATIVE AMERICANS IN THE UNITED STATES AND COLORADO

Although this lawsuit was not filed until 1989 by these Plaintiffs, the history of discrimination against Native Americans in the United States, and Colorado in particular, goes back well over 100 years.

Even the United States Supreme Court, in a decision as late as 1894, expressed the opinion that Indians were "an ignorant and dependent race." *Missouri, K. & T. Ry. Co. v. Roberts,* 152 U.S. 114, 117, 14 S.Ct. 496, 497, 38 L.Ed. 377 (1894). *See also, Ex parte Kan-Gi-Shun-Ca (otherwise known as Crow Dog),* 109 U.S. 556, 571, 3 S.Ct. 396, 406, 27 L.Ed. 1030 (1883) (Indians lived a "free though savage life.")

The Plaintiffs in this case are descendants of a proud people who, during the history of our country, and especially in the 18th and early 19th century, exhibited an independent nature in the western and southwestern United States. During this period, the Ute Nation had several subdivisions in Colorado. The White River Utes ranged across northern Colorado and the Tabeguache or Uncompahgre Utes lived in the central mountains of Colorado, including the area of South Park, Gunnison, and the Uncompahgre Valley. The Southern Ute Divisions were the Mauche, Capote, and the Weminuche. The Mauche lived in the mountains of the Colorado front range between the site of Denver in the north and the Sangre de Cristo mountains in New Mexico. They hunted the plains of southeastern Colorado and northeastern New Mexico, reaching as far as the panhandle of Texas.

The Capote occupied the area between the Sangre de Cristos on the east and the Continental Divide on the west; thus, they were located in the San Luis Valley and along the Chama Valley of New Mexico. The Weminuche were located west of the Continental Divide and north of the San Juan River, which generally marked their boundary with the Navajos. Their normal territory extended westward to the Blue Mountains and canyon lands of southeastern Utah. Report of Robert N. Ellis, Plaintiff's Exhibit 6, pp. 9–10. This was truly a vast land and a proud people.

The first official United States contact with the Colorado Utes occurred soon after General Stephen Watts Kearny took control of New Mexico in 1846. Agents were sent into the San Luis Valley to convince a Ute delegate to visit Santa Fe where they met with U.S. Army officials and agreed to remain neutral. By the terms of the Treaty of Guadalupe Hidalgo of 1848, all of the Utes were now placed under the control of the United States. In 1849, the United States negotiated a treaty with the Utes at Abiquiu, New Mexico, in which the Utes recognized the sovereignty of the United States and agreed to stay in their accustomed places. But soon thereafter settlers moved northward from New Mexico into Ute territory in the San Luis Valley causing friction between the settlers and the Indians.

In 1854, a conflict between the Utes and the settlers in the vicinity of modern-day Pueblo, resulted in a military campaign against the Utes in 1855. After being defeated in several military engagements, the Utes eventually agreed to a treaty in 1855 that was not ratified by the United States. The Gold Rush to Colorado in 1858 and 1859 brought increased contact between whites and Utes and brought increased pressure upon Ute lands. As early as 1862, the Colorado Territory delegate to Congress wrote the Commissioner of Indian Affairs that "Mining population of Colorado are entirely overrunning the hunting grounds of Ute Indians, occupying portions of it and taking out large quantities of gold, killing and driving out game." Colorado officials wished to clear title to portions of Ute territory and open it up to mining. Exhibit 6, p. 11 (citation omitted).

In 1863, treaty negotiations were held with the Utes. Only a few of the Utes attended the negotiations and only the Tabeguache Utes signed the treaty which was ratified by the Senate in 1864. This treaty reduced the Ute land by about one-quarter and included the cession to the United States of the San Luis Valley. The San Luis Valley actually belonged to the Capote Utes who did not even sign the treaty. The treaty also ceded mining areas between the Arkansas River and North Park. Exhibit 6, pp. 11–12.

Despite approval of this treaty, demand for Ute land continued unabated. Although federal Indian law supposedly provided for protection of Indian country and should have provided for the protection of the territory of the Utes, miners continued to push westward across the Colorado Territory and farmers and rangers moved northward out of New Mexico into the southern part of the territory belonging to the Utes. Exhibit 6, p. 12.

In 1868, more treaty negotiations took place in Washington with the Utes. The treaty of 1868 further reduced Ute lands. The tribe accepted a reservation located basically in western Colorado. The reservation was bounded on the east by the 107th meridian and on the north by a line that was located 15 miles north of the 40th parallel. Thus the reservation was generally south of the present-day Moffat County, while the eastern border was in the general vicinity of the present-day Basalt and Pagosa Springs. Exhibit 6, pp. 12–13.

The Treaty of 1868 promised protection of Ute lands. One of its articles stated "the United States now solemnly agree[s] that no persons, except those herein authorized so to do, and [except] such officers, agents and employees of the Government as may be authorized to enter upon Indian reservations in discharge of [their] duties . . ., shall ever be permitted to pass over, settle upon, or reside in the Territory described in this article, except as herein otherwise provided." Exhibit 6, p. 13 (quoting The Treaty of 1868).

The United States also promised to pay the Utes for the ceded land and promised to establish two reservations with schools and other facilities. The intention was to teach the Utes to become farmers and thus self-sufficient. Unfortunately the agencies established for them were at White River and in the Cochetopa Hills between the present-day Gunnison and Saguache, an area that was unsuitable for agriculture. Ink on the 1868 treaty was hardly dry before a major invasion of miners entered Ute lands in violation of the treaty. Exhibit 6, p. 14.

During these years, there was a strong anti-Indian sentiment expressed in the press and by politicians. For example, on August 10, 1864, an appeal was issued by the Governor of Colorado to the people to defend themselves and kill Indians. Exhibit 6, p. 6. All this anti-Indian sentiment culminated in November 1864, when the Colorado Volunteers made a surprise attack on a Cheyenne and Arapahoe village at Sand Creek in eastern Colorado. Newspapers of the day greeted reports of the massacre with unanimous approval. Exhibit 6, p. 7. After the massacre, despite congressional investigations which issued reports severely critical of the actions of the Colorado Volunteers, support continued in Colorado for the participants of the attack both by the public and in the press. The battle cry in Colorado seemed to be to exterminate the Indians. Exhibit 6, p. 8.

The massacre brought retaliation by the Indians and inflamed further hatred by the settlers and the Colorado press. These attitudes continued through the decade of the

1860s. It was as a result of the increased demands for Indian lands and this overall hatred of Indians that the treaty of 1868 was eventually negotiated. In 1872, the President was asked to again renegotiate the Ute treaty of 1868 because of the discovery of gold and silver in the southern portion of the Reservation. Bowing to the intense pressure of white settlers, and over the objections of the Indians, the treaty of 1868 was renegotiated by Felix Brunot. The Brunot Agreement, approved by Congress in 1874, ceded the mineral rich San Juan Mountain area, a rectangular tract in the middle section of the 1868 reservation comprising of approximately one-fourth of the reservation to the United States. Exhibit 6, p. 22.

Historians seem to agree that, although the Utes agreed to the Brunot Agreement, in doing so they had expressed a willingness to sell only the areas where no mining actively took place. They refused to sell the valleys and those areas where no mining occurred. They appeared willing to have miners come into the mining camps in the spring but insisted that they leave again each fall. Under the terms of the agreement, however, the block of land was simply removed from the reservation. The Brunot Agreement became the subject of considerable dispute. Ute leaders claimed that they had sold only the mining regions and not the entire area and that the miners were to leave each winter. These claims were allegedly confirmed by negotiators. *Id.*

Despite the Brunot Agreement, trouble with the boundary lines continued. The Agreement had specifically reserved to the Utes the Uncompahgre Park located in the valley north of present-day site of Ouray. However, government surveyors ran the line incorrectly so that the Uncompahgre Park was excluded from the reservation. It appears, too, that the boundary near the White River was some seventeen and a half miles off, to the disadvantage of the Utes. When settlers rushed into Uncompahgre Park and were given support by the locals, the Government ultimately gave in and not only tolerated but indeed permitted the loss to the Utes of the Uncompahgre Park. Exhibit 6, p. 23.

Again, the citizenry and the press expressed strong anti-Ute sentiment. For example, the December 22, 1877 issue of the Ouray Times indicated that the people of Ouray wanted the removal of the Utes who were "a non-producing, semi-barbarous people," who retarded the development of the area. Exhibit 6, p. 24. The Government also failed to pay the Utes the amount of money promised. Exhibit 6, p. 25.

In February 1876, the year of statehood, the Colorado legislature memorialized a desire for the removal of the Utes to Indian territory. Early in 1878, several bills were introduced into Congress to secure removal of the Utes. *Id.*

Pressure to remove the Utes received a great impetus when the Utes in the White River Agency in northern Colorado killed Agent Nathan Meeker and others, and then engaged in combat with troops that approached from the north. The so-called Meeker Massacre inflamed public opinion and also caused panic in many areas of the state. Demands were heard for either removal or extermination of the Utes. In response to the many demands of the state of Colorado and pressure from the press, Congress enacted a law in 1880 relinquishing to the United States a large portion of the previous Ute Reservation, removing the northern Ute bands to the Uintah reservation in Utah and removing the other Ute bands to smaller tracts in southwestern Colorado.

The report of Robert N. Ellis, Exhibit 6, contains examples too numerous to discuss in detail regarding the degrading press coverage and attitudes of the people of the time. The evidence reveals that the attitudes of the politicians, the press, and some of the people of the time exhibited a keen hatred for the Ute Indians and their way of life.

Petitions were made to Congress in 1885 and again in 1887 for the removal of all remaining Utes from the State of Colorado. In 1895, Congress allotted, or deeded, the remaining Ute lands in Colorado to individual members of the Southern Ute bands and provided a small reservation on the west 40 miles of the present reservation for those who choose not to take the allotments. Act of February 20, 1895, Ch. 113, 28 Stat. 677.

Those choosing against the allotments included almost the entire Weminuche band. This was the beginning of the separation of the three bands of the southern Utes into two groups, the Mauche and the Capote bands located in the eastern portion of the reservation and the Weminuche band located in the western end of the reservation. After the turn of the century the two sections became known as the Ute Mountain Reservation, home of the Weminuche band and the Southern Ute Reservation, home of the Mauche and Capote bands. These are the reservations as they exist today.

Since the early development of Indian relations, it has been the goal of the Government to attempt to change the Indian's way of life. The Indian has been perceived to be different and his tribal ways to be unacceptable in an civilized society. The Commissioner of Indian Affairs explained in 1881, as a rationale for federal policy, that 'savage and civilized life' cannot live and prosper together. One of the two must die. If the Indians were to be a civilized people and become happy and prosperous, he felt they should learn our language and adopt our modes and ways of life. Hiram Price, *Annual Report of the Commissioner of Indian Affairs* (1881).

Indian integration into society meant, among other things, attempts to destroy their culture and their tribal system. One of the methods to accomplish this end was to allot reservation lands away from the tribes to individuals. In 1887, Congress enacted the General Allotment Act, known as the Dawes Act, ch. 119, 24 Stat. 388 (1887), authorizing the allotment of reservation land to individual Indian residents, the purchase by the United States of unallotted land, and citizenship for Indians living separate and apart from any tribe therein who had elected to adopt the habits of 'civilized life.'

An obvious consequence of removing the ownership of the reservation from the tribes into individual tracts was a substantial loss of land from tribal ownership into non-Indian ownership. Between 1887 and 1934, approximately two-thirds of the Indian land passed out of Indian ownership into non-Indian hands. This was the intent of the Government. *See Draper v. United States,* 164 U.S. 240, 246, 17 S.Ct. 107, 109, 41 L.Ed. 419 (1896) (describing the purpose of the Dawes Act as "the gradual extinction of Indian reservations and Indian titles"). Federal policy all too soon separated Indians and their tribes from their lands. This policy also meant taking the Indians away from the influence of their tribes, their rights, and their customs.

Indian schools were forbidden to instruct in any Indian language. English was required. The Commissioner of Indian Affairs proposed a national system of Indian schools whose goal was to seek the disintegration of the tribes. *See* Thomas J. Morgan, *Supplemental Report on Indian Education* (1889). The Commissioner put it bluntly, "The Indians must conform to 'the white man's ways,' peaceably if they will, forcibly if they must.... This civilization may not be the best possible, but it is the best the Indians can get. They cannot escape it, and must either conform to it or be crushed by it." *Annual Report of the Commissioner of Indian Affairs* (1889).

Congress recognized the inequities of the past in a 1969 report which conceded that the past policies of coercive assimilation had resulted in the "destruction and disorganization of Indian communities and individuals;" a "desperately severe and self-perpetuating cycle of poverty for most Indians;" "[p]rejudice, racial intolerance, and discrimination towards Indians ...." and "[s]chools which fail to understand or adopt to, and in fact often denigrate, cultural differences." S.Rep. No. 501, 91st Cong.2d Sess. 21 (1969).

The condition of American Indians just prior to World War II was bleak. Their living conditions were intolerable and they had little or no ability to earn income. They had no freedom or franchise in many cases. Their native culture had been greatly diminished and they were unprepared and unable to live in the white man's world. Lewis Meriam and Associates, *The Problem of Indian Administration* (1928). Congress, recognizing the extreme conditions under which the Indians were being required to live, responded by enacting the Indian Reorganization Act of 1934. The Act signalled a major shift in federal policy which ended allotments, authorized the Secretary of the Interior to restore tribal land bases, regulat-

ed tribal resources, promoted economic development, gave Indians preference in the Bureau of Indian Affairs hiring and provided mechanisms for chartering and reorganizing tribal governments. Pub.L. No. 73–383, §§ 1, 3, 5–6, 48 Stat. 984 (1934).

The Government had finally recognized the error of their ways in the Indian policy over the past 50 years. The declared purpose of the Indian Reorganization Act was "to rehabilitate the Indian's economic life and to give him a chance to develop the initiative destroyed by a century of oppression and paternalism." H.R.Rep. No. 1804, 73d Cong., 2d Sess. 6 (1934).

Following passage of the Indian Reorganization Act, some former Ute lands were restored to tribal ownership. In 1950, the Court of Claims awarded over $31 million to the Utes as additional and just compensation for lands ceded by them to the United States in 1880. *Confederated Bands of Ute Indians v. United States,* 117 Ct.Cl. 433 (1950).

In 1962, the Indian Claims Commission held that the consideration paid to the Utes for lands ceded in the Brunot Agreement was so inadequate as to be unconscionable. *Confederated Bands of Ute Indians 'v. United States,* 11 Ind. Cl. Comm. 180, 303 (1962).

In his Message to Congress on Goals and Programs for the American Indian in 1968, President Lyndon Johnson commented on the tragic plight of Native Americans in education, health, and economic development; recognized a tribal right to "freedom of choice and self determination;" and called for "new ways to provide Federal assistance to Indians—with new emphasis on Indian self-help and with respect for Indian culture." President Johnson's Message to Congress on Goals and Programs for the American Indian, IV Weekly Comp. Pres. Doc. 438 (Mar. 6, 1968).

The plight of the Ute Mountain Utes was a particularly dire one. In the 1960s there were only just over 900 tribal members and their infant mortality rate was so high that their death as a viable cultural group could be predicted. Report of Amanda Bandy.

As part of the federal agenda in promoting Indian self determination, Congress enacted the Civil Rights Act of 1968, Pub.L. No. 90–284, § 402, 82 Stat. 73, 79, prohibiting states from acquiring any jurisdiction over Indian reservations without the consent of the affected tribe, and authorizing the United States to accept a retrocession by any state of criminal or civil jurisdiction over Indian reservations.

President Richard Nixon also acknowledged, in a 1970 address to Congress, that "The First Americans—the Indians—are the most deprived and most isolated minority group in our nation. On virtually every scale of measurement—employment, income, education, health—the condition of the Indian people ranks at the bottom. This condition is the heritage of centuries of injustice. From the time of their first contact with European settlers, the American Indians have been oppressed and brutalized, deprived of their ancestral lands and denied the opportunity to control their own destiny." President's Special Message to Congress on Indian Affairs, 1970 *Pub. Papers: Richard Nixon* 564–67, 575–76 (July 8, 1970).

Congress has also noted, as late as 1974, the very low levels of economic activity on Indian reservations. On every reservation to that date, there was an almost total lack of economic community, and opportunity. In 1975, in response to these problems, Congress enacted the Indian Self–Determination and Education Assistance Act, Pub.L. No. 93–638, §§ 2–3, 88 Stat. 2203, 2203–04 (1975), which declared a major national goal of the United States to be providing the quantity and quality of educational services and opportunities which would permit Indian children to compete and excel in life areas of their choice, and to achieve a measure of self-determination essential to their racial and economic well-being.

The Indian Health Care Improvement Act, Pub L. No. 94–437, § 2, 90 Stat. 1400, 1400–01 (1976), noted that the unmet needs of the American Indian people were severe and the health status of the Indians were far below that of the general population of the United States.

House reports observed the prevalence of disease among Indians and concluded that lack of knowledge, unawareness, insensitivity, and neglect were the keynotes of the Federal Government's interaction with tradi-

tional Indian problems, religions, and culture. The state of affairs was enhanced by the perception of many non-Indian officials that because Indian religious practices were different, they did not constitute a 'real' religion.

A Joint Resolution on American Indian Religious Freedom Act, Pub.L. No. 95–341, 92 Stat. 469 (1978), concluded "traditional American Indian ceremonies have been intruded upon, interfered with, and in a few instances, banned," and protected the "use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites." Congress also noted that, "The wholesale separation of Indian children from their families is perhaps the most tragic and destructive aspect of American Indian life today.... The disparity in placement rates for Indians and non-Indians is shocking." H.Rep. No. 1386, 95th Cong., 2d Sess. 9 (1978).

Congress found in the Indian Child Welfare Act, Pub.L. No. 95–608, § 2, 92 Stat. 3069 (1978), "that an alarmingly high percentage of Indian families are broken up by removal, often unwarranted, of children by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions."

It is blatantly obvious from the facts set forth in this historical background that the Native American people in the United States and in Colorado in particular have been the victims of pervasive discrimination and abuse at the hands of the government, the press, and the people of the United States and Colorado in particular. The evidence discloses no less of a problem in Montezuma County, the home of the Ute Mountain Ute tribe. Even at the beginning of this century, anti-Indian attitudes were apparent in the minds of most Coloradans, particularly in the Montezuma County area. Exhibit 6, p. 55. Communities surrounding the Ute Reservation treated Indians as second-class citizens. They were discouraged from attending public schools. Discrimination was rampant against Ute children. They were perceived to be unhealthy, unsanitary, and most of all, unwelcome.

Many of the witnesses at trial testified about unfriendly teachers and whippings, as well as fights after school because of their Indian heritage. Most were forced to leave the public school system and go to boarding schools under Indian programs. Since all instruction in the public schools was in English, several testified of being whipped if they attempted to speak Ute. They were required to cut off their traditional braids and long hair. Witnesses testified about poverty and poor living conditions evidenced by no money, no water and no sewer system. Sickness ran rampant on the reservation. Jobs and education were scarce. The local communities did nothing to assist the Indians but simply left it up to the federal government to support them. Per capita payments were made to tribal members from tribal trust funds and this was perceived to be sufficient. Some Indians lost their purpose in life and many simply "dropped out."

It seems there was no appreciable change in attitudes in the surrounding community until the economic benefits from the reservation and its residents became apparent. With the sale of oil and gas leases and the receipt of revenues from judgments before the U.S. Court of Claims, the local communities stood to benefit from the increased funds available to tribal members. Expenditure of federal funds for Indian rehabilitation projects also had the potential to benefit the surrounding community. Exhibit 6 Supplement, pp. 8–9. Sharply divided interests and attitudes over Indian rights remained though, and abuses abounded such as discrimination in law enforcement, health care, and employment as well as incidents of double pricing and disputes over hunting rights. Exhibit 6, Supplement, pp. 15–21.

In addition, there existed continued opposition to any bi-lingual or bi-cultural education. Disputes over land claims remained. Water rights and tribal sovereignty issues were hotly contested and the local populous made clear their continuing objections to the non-payment of taxes by Indians. Exhibit 6, Supplement, pp. 22–24. The public generally still harbored attitudes that Indians were lazy and not to be trusted. Stories abounded of Indians being "ripped off" by businesses

when oil and gas royalties and other tribal revenues allowed Indians to buy hard goods, automobiles, and other items. Until recently, there appeared to be little understanding of the tribe and its ways and only a minimum of effort to increase that understanding, despite the fact that the reservation and its residents were but a mere eleven miles from Cortez, the main city in the county.

All of the above made it extremely difficult for the Indians to establish any alliances with the whites in the cultural or political arena. Into the late 1970's and 1980's there remained a significant antagonism against Indians and a resulting mistrust by Indians of the non-Indian community.

### THE UTE MOUNTAIN UTE COMMUNITY AS IT EXISTS TODAY

The Native American population in Montezuma County comprises a distinct community as evidenced by the interest and active participation by almost all of the members in tribal elections and tribal policies. The tribal members have common social, cultural, religious, historical, and economic interests and concerns. The reservation is clearly unique both in its culture and in its background. The residents of the reservation have distinct status by virtue of Government treaties and tribal membership.

The Ute Mountain Ute Tribal Council dates back to the late 1930's or early 1940's. The tribe's constitution provides that only reservation voters may cast ballots in tribal elections. It is undisputed that Reservation residents participate in tribal elections in far greater numbers than they do in non-tribal elections. This is further evidence of the strong community of interest of tribal members. The evidence clearly indicates a strong interest and involvement in tribal affairs. The Utes often conduct sophisticated campaigns for elections. They publicize their candidacies in the tribal newspaper, on the cable television station and by radio. Financial contributions to campaigns are solicited. Support groups and committees are formed to advance candidates. No such participation by tribal members has ever occurred in a non-tribal election where a Ute candidate has been running. This is another indication of the reticence of the Native

American population of Montezuma County to integrate into the non-Indian population. It is an obvious outgrowth of the discrimination and mistreatment of the Native Americans in the past.

Of course, there are also individual concerns and personal differences in reservation life. The Ute culture is very family centered. This gives rise to family rivalries on the reservation. These disputes have sometimes affected the voting behavior of the Native American population. On occasion it has been acknowledged that unity is a problem and pleas have been made to put personal and family differences aside in an effort to garner support for Ute candidates in elections. Defendants have argued that this is indicative of an absence of cohesion amongst the Native American population. It cannot be denied though that Native Americans in Montezuma County share a distinct community of interest because of the wide variety of concerns they share, as referred to previously. It would be difficult to imagine any group of people constituting a more closely knit community, based upon their common history and shared social, political, and economic characteristics, than the residents of the Ute Mountain Ute Reservation.

Still, when they get outside of the Reservation, the Utes do not appear to actively campaign or readily seek help from the non-Indian community. There still exist substantial cultural and language barriers between the Native American and non-Indian communities in Montezuma County which clearly inhibit the effective participation of Native Americans in the community affairs and the political process. This is still a new process to Native Americans. They were not allowed to serve on juries in Montezuma County until 1956. They have been historically denied the right to vote in Colorado until fairly recently. As late as 1960, the Attorney General of Colorado refused to allow the voting of residents of the reservation. In 1966 and 1969, this remained an issue in Montezuma County. In 1969, the Colorado Attorney General finally issued an opinion stating that tribal members who lived on the reservation could vote. Finally, in 1970, the Colorado Consti-

tution was amended to allow tribal members residing on the Reservation the franchise.

The first Native American candidate for the Board of Education, Mary Coyote, ran in 1969. Even after the Native Americans received the franchise, they had difficulties with the elective process. Until the late 1980's or early 1990's, Utes were denied the right to register at Towaoc despite the fact that the non-Indian population was allowed satellite registration in such communities as Mancus and Dolores. This worked against Native American registration due to the amount of time that it took to get to town, a lack of transportation in many cases, language barriers, and the like. Even when mobile registration was finally allowed on the Reservation, its hours were very limited.

The evidence in this case clearly indicates a polarization of the Native American and non-Indian communities in the Montezuma–Cortez–Towaoc area. For individuals, this starts at an early age, in school, and continues into adulthood. Many Native Americans have a strong interest in the educational process which has not been addressed to their satisfaction in the past. There appears to be a real question of the School Board's understanding of the issues of Native American problems, interests, and concerns, although certainly efforts have been made to address this problem. Despite indications of a strong interest by many in the Native American community in participation in public affairs by election to public office, prior to the trial of this matter in October 1997, no Native American had ever been elected to public office in Montezuma County.

At the request of counsel for the Defendants in a motion filed on November 25, 1997, which was heard on January 16, 1998, after full briefing by the parties, the Court allowed additional evidence with respect to the election held in November 1997, after the completion of the trial in this matter. That evidence revealed that Tina Galyon, a Ute candidate running unopposed for a seat on the School Board from Director District B, was elected to that position. Defendants also note that a majority of non-Indians voted for Native American candidates in the November 1997 School Board election for Director District D. However, the candidate who won the seat on the School Board from Director District D was Susan Baacke, a non-Indian, relative newcomer to the School District and a political unknown. She was opposed by three Native American candidates in that election.

The evidence in this case analyzed elections for School Board positions from 1969 through the afore-referenced election in November 1997. Evidence regarding the 1969, 1973, 1985, 1989, 1991, 1993, and 1995 elections was received. A statistical analysis of the 1969 and 1973 elections involving Native American candidates Coyote and Eyetoo was not possible because data were not available for both elections. However, the Native American candidate was defeated in each election. A newspaper article from 1973 reveals the support that Mr. Eyetoo received in the 1973 election from the Native American community. Of 17 votes cast in the Towaoc precinct, 12 voted for Mr. Eyetoo. Exhibit 52. Notwithstanding the small numbers, that indicates that he received 71% of the Native American votes in that election.

For the elections in 1985 and 1989, two types of analysis were used, ecological regression analysis and extreme case analysis, also referred to as homogeneous precinct analysis. A review of the results of the ecological regression analysis shows that, in general, different candidates were chosen by Native American voters than by non-Indian voters. The analysis reveals high levels of Native American support in elections involving Native American candidates. The average level of Native American support for Native American candidates was 81%. There was a similarly high level of non-Indian support for non-Indian candidates, with the average level being 73%. Plaintiffs' Exhibit 4, Table I. With the use of homogeneous precinct analysis, a pattern of polarized voting similar to that revealed by the regression analysis was obvious. The more straight forward homogeneous precinct analysis corroborated the results of the economic regression study.

In the 1989 election, all but five of the 90 Native Americans who voted were in Precinct 6 and there were no non-Indian voters in that precinct. Accordingly, as Defendants' expert put it, there was no mystery as to how

the separate groups voted in 1989. Therefore the ecological regression analysis was not even needed to estimate the level of support for the candidates. In the 1989 election, the data clearly showed, and the parties agreed, that in the District B and D contests, the Native Americans were cohesive in their support of Native American candidates and their voting was clearly polarized. In the Native American precincts, the level of support for Native American candidates was 87%, while the level of support for non-Indian candidates in non-Indian precincts was 68.5%.

Another distinguishing feature of the 1989 election was a very small margin of error surrounding the estimate of how Native Americans voted. This homogeneous case analysis, especially as it involved the 1989 elections, was a clear indication with a small margin of error of the high levels of polarization and was consistent with the regression analysis findings. Data from the 1990 census indicates that 11.9% of the voting age population of the Montezuma–Cortez School District are Native American whereas 53.0% of the voting age population of a single member District D are Native American.

If we were to assume equal levels of Native American and white[2] voter turnout and use the average levels of Native American and white voter cohesion as found from the regression analysis of the election of 1985 and 1989 (81% and 73% respectively), a Native American candidate could expect 53.4% of the vote in the District D compared to 33.7% of the vote in a election in the School District at large. It is quite obvious that an election on an at-large voting basis in the Montezuma–Cortez School District would make it substantially more difficult for Native American voters to elect the candidate of their choice to the School Board.

In the 1989 election for District D, Mr. Cuthair, the Ute candidate was defeated by Mr. Whitmer, the non-Indian candidate—372 to 228 votes. Had that election been held only in District D as opposed to an at-large district, Mr. Cuthair would have received 66 (56.9%) of the 116 votes cast and would have been elected.

There were three Montezuma–Cortez School Board contests after the 1989 election and the 1990 consent decree in this case. Under the terms of the consent decree, the Director District D election became a single member voting district for the years 1991 and 1993. Only the voters who lived in that district could cast a ballot for the District D seat. In 1991, the non-Indian candidate, Whitmer, easily defeated the Ute candidate Colorow by a 57% to 43% margin. In the 1991 contest, the homogeneous precinct analysis again demonstrated racial polarization in the voting.

Also a factor in the 1991 election, were bond issues which brought non-Indian voters out in greatly increased numbers. The Native Americans on the other hand, not being subject to taxation or payments for bonds, voted in about the same numbers as previously. This election also involved hotly contested issues with regard to the makeup of the School Board during the previous years. All the incumbents (all non-Native Americans) who sought re-election in 1991 were defeated with the exception of Mr. Whitmer who was the only incumbent who faced a Native American as an opponent. Although not a mathematical certainty, it appears clear that had the turnout in the 1991 election been consistent with turnouts in previous elections, Colorow, the Native American candidate would have had a much better chance to be elected.

Bond issues are also relevant to the issue of political cohesiveness from another perspective. In 1990, a bond issue was proposed and the tribal library at Towaoc was used as a precinct for the election. The voters at the tribal library were overwhelmingly Native American. The vote in favor of the bonds at this precinct was 59 in favor and 4 against the first bond issue, and 56 in favor and 5 against the second bond issue. This result in a homogeneous Native American precinct clearly indicates political cohesiveness of the Native American community in support of the bond issue. On the other hand, the non-Indian community defeated the bond referen-

---

**2.** The evidence revealed that the vast majority of the non-Indian voters in the county are what will be described as 'white' as there is only a very small population of Hispanics or any other group.

dum which would raise taxes on the non-Indian community. This vote was consistent with a second vote in 1991 where the bonds were defeated in an election where the homogeneous Native American district voted in favor of the bonds.

It is also clear that the Native American community has joined together on many other projects, boards, and commissions designed to preserve and perpetuate Native American culture and Indian tradition. The evidence taken as a whole clearly indicates a cohesiveness in the Native American community.

In the 1993 election for the School Board, Yvonne House ran in Director District D. She submitted a petition, but her petition was rejected for lack of sufficient qualified signatures. This forced her to run as a write-in candidate. Ms. House was employed by the tribe and her job involved collecting tribal bills. She was not popular with some members of the tribe based on her occupation. This could explain some lack of support by the Native American community. Furthermore, the 1993 election involved a major change in the date of the election for School Board—from spring to fall.

It also appears that at the time of the election, there was substantial confusion about how to vote for a write-in candidate. Some Native American voters had difficulty understanding the procedure due to language barriers and a lack of education and it appears that a significant number of Native American votes may have been voided. Although this is not a total explanation of the huge margin of defeat (Ms. House only received 17 votes), these factors appear to skewer the results of the 1993 election as they might be relevant to the issues here.

Julia Donald was a Native American candidate for the School Board in 1995 from Director District A. Voting in the election was at-large, excluding the residents of District D. Ms. Donald was defeated. An analysis of the voting in that election shows that the non-Indian candidates received approximately 87% of the white vote, while Ms. Donald received at most 13%. This is clearly indicative that, in overwhelmingly non-Indian precincts, a Native American candidate could expect to receive only a small non-Indian

cross-over vote if non-Indian candidates are also running.

Finally, a review of the total voter registrations set forth in Joint Exhibit No. 1 may also be revealing as to the non-Indian reaction to the issues addressed in this case. The registration in the Towaoc precinct has increased in the period of 1985 to 1997 from 74 to 254. The evidence indicates a dramatic increase from 1985 until 1991 with virtually no increase from 1991 until 1997. By contrast, in Precinct 7, a non-Indian precinct, the 1991 registration figure was 249 and has increased to 611 in 1997. This dramatic increase in non-Indian registrations, with a lack of any such increase in Native American registrations, could be indicative of a reaction by the non-Indian voters in the School District to the actions of the Plaintiffs and the Court in this matter.

### LEGAL ANALYSIS

As amended, § 2(a) of the Voting Rights Act declares "No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2) of this title, [42 U.S.C. § 1973b(f)(2) ] as provided in subsection (b)." 42 U.S.C.1973(a). Section 4(f)(2) states "No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or implied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote because he is a member of a language minority group." 42 U.S.C. § 1973b(f)(2).

Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, provides further:

(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the

electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

Plaintiffs here are members of a class of citizens protected by § 1973(a), 42 U.S.C. § 1973b(f)(2). American Indians were specifically included within the coverage of § 2 by amendments to the Act in 1975 to include language minorities, defined as "American Indians, Asian Americans, Alaskan Natives, and those of Spanish heritage." 42 U.S.C. § 1973aa–1a(e). *Windy Boy v. Big Horn County,* 647 F.Supp. 1002, 1006 (D.Mont. 1986); *Buckanaga v. Sisseton Independent School District,* 804 F.2d 469 (8th Cir.1986).

Section 2 has been interpreted to require plaintiffs to prove that a contested electoral practice was intentionally adopted or maintained by state officials for a discriminatory purpose. *City of Mobile, Ala. v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). Congress thereafter amended § 2 to include the results or racial fairness standard of *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973). *See Thornburg v. Gingles,* 478 U.S. 30, 35, 106 S.Ct. 2752, 2758, 92 L.Ed.2d 25 (1986).

■ Section 2 claims are analyzed under a two-part framework. *Magnolia Bar Association, Inc. v. Lee,* 994 F.2d 1143, 1146 (5th Cir.), *cert. denied,* 510 U.S. 994, 114 S.Ct. 555, 126 L.Ed.2d 456 (1993). To prevail on a § 2 claim, plaintiffs must first satisfy certain threshold requirements set forth by the Supreme Court in *Gingles.* The minority voters must then offer evidence of the totality of circumstances which demonstrate that the challenged election practice "has resulted in the denial or abridgement of the right to vote based on color or race." *Magnolia,* 994 F.2d at 1146, quoting *Chisom v. Roemer,* 501 U.S. 380, 393, 111 S.Ct. 2354, 2363, 115 L.Ed.2d 348 (1991).

■ *Gingles* provides a framework for considering the factors discussed in the Senate Report by recognizing the conjunction of three circumstances which must be present to establish a vote dilution claim. Indeed, their presence creates the inference that the challenged practice is discriminatory. First, minority plaintiffs must prove their group is sufficient "large and geographically compact to constitute a majority in a single-member district." *Gingles,* 478 U.S. at 50, 106 S.Ct. 2752. Second, plaintiffs must show the minority group is "politically cohesive." *Id.* at 51, 106 S.Ct. 2752. Third, they must demonstrate "the white majority votes sufficiently as a bloc to enable it in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate." *Id.* While these three conditions are necessary to establish a vote dilution claim, they are not sufficient by themselves. *Johnson v. DeGrandy,* 512 U.S. 997, 114 S.Ct. 2647, 2657, 129 L.Ed.2d 775 (1994).

■ The legislative history of § 2, particularly the Senate report indicates that "a variety of factors, depending upon the kind of rule, practice, or procedure called into question" are relevant in determining if a plan "results" in discrimination. S.Rep. No. 97–417 at 28–9 (1982). These factors are set out in *Gingles,* 478 U.S. at 36, 106 S.Ct. 2752. They include the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process; the extent to which voting in the elections of the state and political subdivision is racially polarized; the extent to which the state or political subdivision has used voting practices or procedures that may enhance the opportunity for discrimination against the minority group; the existence of a candidate slating process; the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process; whether political campaigns have been characterized by overt or subtle racial appeals; and the extent to which members of the minority group have been elected to public office in the jurisdiction. *Id.*

Additional factors which can have probative value are whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of members of the minority group and whether the policy underlying the state or political subdivision's use of such voting qualifications, prerequisites to voting, or standard, practice, or procedure is tenuous. *Id.*

■ There is no requirement that any particular number of the factors set forth above be proved. The plaintiffs also need not show that the majority of them point one way or another. The determination of the issue is left to the court's judgment based on the totality of the circumstances and guided by the relevant factors in the case at bar. The issue is whether the voting strength of the minority voters is minimized or canceled. To answer this question, the court must use objective factors to assess the impact of the contested structure or practice on minority electoral opportunities. *Gingles,* 478 U.S. at 44, 106 S.Ct. 2752 (citing S.Rep. No. 97-417 at 28-9 (1982)).

■ The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by the protected minority and white voters to elect their preferred representatives. *Gingles,* 478 U.S. at 47, 106 S.Ct. 2752. The Supreme Court has long recognized that multi-member districts and at-large voting schemes may operate to minimize or cancel out the voting strength of racial minorities in the voting population. *Id.* (citations omitted). The theory behind this impairment is that where minority and majority voters consistently prefer different candidates, the majority, by virtue of its sheer numbers, will regularly defeat the choices of minority voters. Minority voters who contend that the multi-member form of districting violates § 2 must prove that the use of a multimember electoral structure operates to minimize or cancel out their ability to elect their preferred candidates. *Id.* (citations omitted).

■ In applying the relevant factors set forth in the Senate Report, the Court should keep certain additional considerations in mind: (1) that the list is exemplary, not exclusive, (2) that there is no requirement that any particular number of factors be proved or that the majority of them point one way or another; and (3) that whether the political processes are equally open depends upon a searching practical evaluation of the past and present reality and upon a functional view of the political process. *Sanchez v. Bond,* 875 F.2d 1488, 1492 (10th Cir.1989), citing *Gingles,* 478 U.S. at 46, 106 S.Ct. 2752.

If these *Gingles* threshold factors are not present, then the challenged electoral practice cannot be considered as a cause of the minorities inability to elect its preferred candidates. *Sanchez v. Bond,* 875 F.2d at 1492. Failure to establish any one of the *Gingles* factors precludes the finding of a § 2 violation. *Growe v. Emison,* 507 U.S. 25, 39–41, 113 S.Ct. 1075, 1084, 122 L.Ed.2d 388 (1993); *Magnolia,* 994 F.2d at 1146. Once the minority group satisfies the *Gingles* threshold inquiry, it must then offer evidence of the totality of the circumstances demonstrating that the minority group has "less opportunity than other members of the electorate to participate in the political process and elect representatives of their choice." *Magnolia,* 994 F.2d at 1146, citing 42 U.S.C. § 1973(b).

### *First Gingles Factor: Size and Geographical Compactness of the Minority Group*

■ The first issue under *Gingles,* whether a minority group is sufficiently large and geographically compact to constitute a majority in a single-member district, simply asks whether any remedy is possible in the first instance. *Sanchez v. State of Colorado,* 97 F.3d 1303, 1311 (10th Cir.1996).

> The reason that a minority group making such a challenge must show, as a threshold matter, that it is sufficiently large and geographically compact to constitute a majority in a single-member district is this: Unless minority voters possess the potential to elect representatives, in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice.

*Gingles,* 478 U.S. at 50., n. 17, 106 S.Ct. 2752.

As a corollary, if the minority group is small and dispersed, no single member dis-

trict could be created to remedy its grievance. *Sanchez v. State of Colorado,* 97 F.3d at 1311. Hence, the first prerequisite asks about the existence of a legally cognizable injury. *Id.* (citation omitted). This element of proof assists a court in finding a reasonable alternative practice as a benchmark against which to measure the existing voting practice. *Id.* (citations omitted). In other words, the inquiries into remedy and liability cannot be separated. A required step in the analysis is a determination whether the court can fashion an appropriate remedy in the context of the system at issue. *Id.*

This *Gingles* precondition presents no great challenge in the case at bar. A simple visual inspection shows that District D is compact, normally shaped, completely rationale in appearance and similar to all other districts contained in the existing plan. It is plainly not the kind of district criticized in *Shaw v. Reno,* 509 U.S. 630, 646, 113 S.Ct. 2816, 2826, 125 L.Ed.2d 511 (1993) and *Miller v. Johnson,* 515 U.S. 900, 908, 115 S.Ct. 2475, 2484, 132 L.Ed.2d 762 (1995).

District D was also drawn based on traditional redistricting principles and these principles were not subordinated to race or any other suspect criteria. Defendants' expert who drew the redistricting plans for the School District in 1993 and 1997 complied completely with traditional redistricting criteria. He kept the Ute Mountain Ute Reservation in one district and added non-reservation residents solely to comply with the one-person-one-vote requirement. The Reservation has historically been placed in one Director District. Fragmenting the Reservation and placing it in different districts would itself be a departure from the traditional districting principle of maintaining the Reservation in one Director District. Both parties have conceded that they do not contest the districting decisions concerning how District D and other districts were drawn, and there has never been an argument in this case about the size or shape of District D.

### The Second and Third Gingles Factors: Political Cohesiveness of the Minority Group and Racial Bloc Voting

The requirement of political cohesiveness has a functional focus. "If the minority group is not politically cohesive, it cannot be

said that the selection of a multi-member electoral structure thwarts distinctive minority group interests." *Sanchez v. State of Colorado,* 97 F.3d at 1312, quoting *Gingles,* 478 U.S. at 51, 106 S.Ct. 2752.

■ *Gingles* adopted a straightforward definition of racial bloc voting provided by the expert witness upon whom the district court had relied. "Racial polarization or bloc voting 'exists where there is a consistent relationship between the race of the voter and the way in which the voter votes ... or to put it differently, where [voters of different races] vote differently.'" *Sanchez v. State of Colorado,* 97 F.3d at 1312, quoting *Gingles,* 478 U.S. at 53, n. 21, 106 S.Ct. 2752. The court must determine both whether minority group members constitute a politically cohesive unit, and whether whites vote sufficiently as a bloc usually to defeat the minority's preferred candidates. *Id.* quoting *Gingles,* 478 U.S. at 56, 106 S.Ct. 2752.

■ The existence of bloc voting must reach a certain level though. The extent to which it impairs the minority's ability to elect candidates of their choice must be "legally sufficient." *Id.* This factor is determined on a sliding scale. It varies based on the district and a variety of other circumstances. *Id.* In some circumstances, a determination of legal sufficiency becomes more apparent over a period of time. *Gingles* did not offer a simple doctrinal test for the existence of legally significant racial bloc voting. Instead, it urged a flexible approach and noted that occasional success by minority candidates in a district with strong evidence of polarization will not alone defeat a showing of bloc voting. It is these aberrations that caused the *Gingles* court to find that an accurate picture of the practices in the district may require study over an extended period. Subtlety in its application does not negate a finding that normally bloc voting enables the majority "to trounce minority preferred candidates most of the time." *Sanchez v. State of Colorado,* 97 F.3d at 1313, quoting *Uno v. City of Holyoke,* 72 F.3d 973, 980 (1st Cir.1995).

■ Consequently, the inquiry into whether legally significant racially polarized

voting exists in a certain area "requires discrete inquires into the minority and white voting practices." *Gingles*, 478 U.S. at 56, 106 S.Ct. 2752. The Supreme Court has unanimously reaffirmed that the political cohesion of a minority group and racial bloc voting never can be assumed. Both factors are necessarily proven to show that the challenged district dilutes minority voting strength in violation of § 2. *Shaw v. Reno*, 509 U.S. 630, 646, 113 S.Ct. 2816, 2830, 125 L.Ed.2d 511 (1993), citing *Growe*, 507 U.S. at 40–41, 113 S.Ct. 1075. A conclusion that there is a lack of equal electoral opportunity under § 2 must be addressed explicitly under the totality of the circumstances without isolating any arguably relevant facts. *DeGrandy*, 512 U.S. at 1012, 114 S.Ct. 2647. "[T]he ultimate conclusions about equality or inequality of opportunity were intended by Congress to be judgments resting on comprehensive, not limited, canvassing of relevant facts." *Id.* at 1011.

Under the authority set forth, it is clear that this Court must examine any "arguably relevant reasons for voting behavior." Accordingly, the Court has not restricted its examination to any one analysis but has considered all of the many factors influencing voting behavior and electoral success which have been shown to be relevant by both the statistical evidence and the other testimony.

The Court concludes that the evidence establishes that Native Americans in the School District are politically cohesive and do tend to vote as a bloc. Plaintiffs introduced evidence of bloc voting through bivarient ecological regression analysis and homogeneous precinct analysis of Native American/non–Indian contests. These statistical techniques are "standard in the literature for the analysis of racially polarized voting," and were expressly relied upon and approved by the Court in *Gingles* 478 U.S. at 53, n. 20, 106 S.Ct. 2752. *See also Sanchez v. State of Colorado*, 97 F.3d at 1321 (rejecting the District Court's critique of bivarient ecological regression analysis and homogeneous precinct analysis as being "without foundation"). Plaintiffs properly focused on the contests involving Native American and non-Indian candidates because those contests give a clear view of the preferences of voters in relevant situations.

The evidence here shows that Native Americans consistently preferred Native American candidates in School District elections. As stated previously, the ecological regression analysis revealed that in certain elections, Native American support for Native American candidates was at a level of approximately 81% while the level of support of non-Indian voters for non-Indian candidates was 73%. The findings of this analysis were supported by the findings of the homogeneous precinct analysis which is more trustworthy because it is more accurately described as a mathematical computation than a method of statistical analysis. Application of these figures to the proportions of voting age population of the groups indicates that Native American candidates have a better chance of success in District D alone than in an at-large system.

The homogeneous precinct analysis is particularly compelling and reliable in this case since virtually all the precincts from School District elections were homogeneous. The exception in this case is the 1985 election in which there was no precinct at Towaoc. When homogeneous precincts exist, estimates of voting patterns are not necessary. The voters in homogeneous non-Indian precincts usually vote for non-Indian candidates while the voters in homogeneous Native American precincts usually vote for Native American candidates. Where all or most of the voters live in homogeneous precincts, one can be confident of how voters are voting throughout the jurisdiction. When a substantial portion of the minority population lives in homogeneous precincts "ecological regression analysis will produce reliable results for that group because the homogeneous precincts anchor the regression line." *Garza v. County of Los Angeles, Cal.*, 756 F.Supp. 1298, 1337–38 (C.D.Cal.1990).

Competent lay testimony can also help establish polarized voting. *Sanchez v. Bond*, 875 F.2d at 1493–94. Here the testimony of experienced local politicians was that voting was clearly polarized. In light of the statistical evidence in the case and the lack of minority electoral success, the testimony is strongly persuasive and highly probative of minority vote dilution.

The polarized voting in this case is legally significant. Native American candidates were preferred by Native American voters in all the contests analyzed by either ecological regression analysis or homogeneous precinct analysis. In contests which were not analyzed by either statistical method, the Native American candidates were also defeated. The fact that, prior to trial in this case, no Native American candidate had ever been elected in a non-tribal election in Montezuma county cannot be disregarded. The legal significance of bloc voting by whites is further illustrated by the fact that had the 1989 election for District D been held only in the district as it was created in 1991, Plaintiff Cuthair would have received 56.9% of the votes cast and would have been elected.

█ Although an adequate statistical analysis was presented in this case, even where a small number of candidates or lack of data prevents the compilation of statistical analysis, a court should rely on other totality of the circumstances to determine if the electoral system has a discriminatory effect. Even where the plaintiffs have proved each of the three *Gingles* preconditions, the Court must go on to make the totality of circumstances determination. *DeGrandy,* 512 U.S. at 1011, 114 S.Ct. 2647. In *DeGrandy* the Court noted that *Gingles* clearly declined to hold the three preconditions sufficient in combination to prove a § 2 claim "either in the sense that a court's examination of relevant circumstances was complete once the three factors were found to exist or in the sense that the three in combination necessarily and in all circumstances demonstrated dilution." *Id.*

Accordingly, the Court would proceed to the totality of circumstances inquiry. Again, the Senate report list of nine factors is not exclusive. The Court must consider any relevant factors in reaching its conclusion and no particular number of factors need be proved.

Whether the political processes are equally open depends upon a searching practical evaluation of the past and present realities and upon a functional view of the political process. *Sanchez v. Bond,* 875 F.2d at 1492, citing *Gingles,* 478 U.S. at 46, 106 S.Ct. at 2764. A § 2 violation may be found only if the challenged practice operates to deny the minority plaintiffs an equal opportunity to participate in the political process and to elect candidates of their choice. *Magnolia,* 994 F.2d at 1147 (citation omitted).

A consideration of the Senate factors as they apply to this case yields the following:

1. The extent of any history of official discrimination in the state or political subdivision that touched upon the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process:

In this opinion, the Court has set forth a detailed analysis of the history of Native Americans in Colorado and in the Montezuma County area over the last 150 years. The evidence revealed a history of discrimination—social, economic, and political, including official discrimination by the state and federal government. Specifically, in Montezuma County, Native Americans have experienced a history of discrimination in both the electoral process and in life in general which has only recently begun to improve.

2. The extent to which the voting in elections of the state of political subdivision is racially polarized:

As discussed previously, the evidence clearly indicates racial polarization between Native Americans and non-Indians in the electoral process. When the Plaintiffs' allegations are evaluated, both by statistical analysis and by factual evidence, strong support for racial polarization is revealed.

3. The extent to which the state or political subdivision has used voting practices or procedures that enhance the opportunity for discrimination against the minority group:

No evidence was introduced with particularity on this factor. There was no evidence of any purposeful efforts at discrimination against the minority group by the state or political subdivision since the 1960's.

4. The existence of a candidate slating process:

No evidence has been introduced by the parties that such a process exists in this jurisdiction.

5. The extent to which members of the minority group in the state or political subdi-

vision bear the effects of discrimination in such areas as education, employment, and health which hinder their ability to participate effectively in the political process:

Plaintiffs' Exhibit 1, information from the 1990 Census of Population and Housing, contains an abundance of information of the depressed socio-economic status of Native Americans in Montezuma County. A sampling of the information contained is as follows:

| | Native Americans | Whites |
| --- | --- | --- |
| Percentage of Incomes Below Poverty Level | 47.77 | 16.59 |
| Per Capita Income | $5,555 | $10,914 |
| Unemployment | 17.73% | 6.51% |
| Education Less than 9th Grade | 20.6% | 8.77% |

There is no doubt that this depressed status was caused, at least in part, by the history of mistreatment alluded to in this order.

6. Whether political campaigns have been characterized by overt or subtle racial appeals:

No evidence of this type of practice was presented by the parties.

7. The extent to which members of a minority group have been elected to public office in the jurisdiction:

As has been noted previously, no Native Americans have ever been elected to any nontribal office in Montezuma County, notwithstanding the fact that some Native Americans participate actively in the community and have shown a keen interest in participation in tribal politics. Members of the Native American community have failed to succeed in finding opportunities to so participate outside the tribal community.

The Court notes that in the November 1997 election, a Native American candidate, Tina Galyon, was elected to the School Board. The parties proffer differing interpretations for this event but the Court finds it is most significant that Ms. Galyon ran unopposed. While the reason for the lack of opponents could be relevant if known, the undeniable result is that her election does nothing to counteract the findings of polarized voting and racial bloc voting.

8. Whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group:

The evidence at trial revealed that serious attempts are being made to implement changes that will help it better meet the needs of its Native American students. Some of these changes have been promoted by the School Board while others have been the result of federal programs such as those resulting from Title VII. There is a Parent Advisory Committee, Limited English Proficiency program (in which 2/3 of the participants are Native American), a Career Ladder program (which encourages the promotion of minority teachers up through the ranks) and a Task Force which includes parents, tribal members and School Board Officials. Several of these mechanisms involve attempts by public officials to improve responsiveness to Native American needs and include the Native American community in the formulation of School Board policies.

There is an issue though of how successful these efforts have been. Plaintiffs point to a School Board response to a Parent Advisory Committee request for development of a mission statement for bilingual education and Native American education programs. The School Board responded that its "District mission statements must be 'ethnically clean.'" Exhibit 23 at p. 2. The Native American community took this response as a rejection of its request and a statement that the curriculum would be 'WASP-based.' Evidence was presented which indicated that the Native American community believed that, because it has been unsuccessful in influencing the School Board from the outside, that it needed to have direct participation on the Board to affect its policymaking.

9. Whether the policy underlying the state or political subdivision's use of such voting qualifications, pre-requisites to voting, or standard practice or procedure is tenuous:

It appears the drawing of the School District boundaries and apportionment was appropriate in this case as following the dictates of § 2 of the Voting Rights Act. The only issue in this case is at-large voting versus the single district voting in District D.

The enumerated factors will often be pertinent in vote dilution claims and any factors that are relevant must be considered. The issue is whether the political processes are equally open. The lack of electoral opportunity is the key. "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an equality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Sanchez v. State of Colorado*, 97 F.3d at 1309, quoting *Gingles*, 478 U.S. at 47, 106 S.Ct. at 2764.

While some of the factors are not relevant to this case, and others show that efforts have been made to improve the situation of the Native Americans in Montezuma County, and particularly the School District, the Court finds that the examination of the circumstances reveals that the rights of the Native American voters have been abridged in violation of § 2 of the Voting Rights Act.

### CONCLUSION

In sum, the Court concludes that the Plaintiffs have shown that Native Americans have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The minority voters have proved that the use of a multimember electoral structure operates to minimize or cancel out their ability to elect their preferred candidates and have therefore shown a violation of § 2. The subject of a remedy for this violation was not addressed at trial. Consequently, the Court will hold a hearing on August 7, 1998 at 9:00 a.m. in Courtroom C–501, U.S. Courthouse, Denver, Colorado regarding proposals for a new procedure or plan for election of the Board of Education which will provide ·Plaintiffs with an effective and prompt remedy for the violation of their rights.

It is, therefore, ORDERED that each party shall file a proposal for an appropriate plan on or before July 27, 1998.

It is, further, ORDERED that Plaintiffs shall file a request for fees and costs of this suit pursuant to 42 U.S.C. § 1973I(e) on or before July 10, 1998. Defendants may respond to Plaintiffs' request on or before July 27, 1998. This matter will also be discussed at the August 7, 1998 hearing.