Earl OLD PERSON, Carol Juneau, Joe MacDonald, Jeannine Padilla, Plaintiffs,

v.

Bob BROWN, Secretary of State for the State of Montana; and Judy Martz, Governor for the State of Montana, Defendants.

No. CV–S–96–04–GF–PMP.

United States District Court, D. Montana, Great Falls Division.

Jan. 24, 2002.

Laughlin McDonald, Neil Bradley, Bryan Sells, American Civil Liberties Union Foundation, Inc., Atlanta, GA, Robert T. Coulter, Helena, MT, Trudy Flamand, Helena, MT, James P. Molloy, Hunt & Molloy, Helena, MT, Beth Brenneman, American Civil Liberties Union of Montana, Helena, MT, for Plaintiffs.

Mike McGrath, Montana Attorney General, Sarah A. Bond, Assistant Attorney General, Helena, MT, for Defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

PRO, District Judge.

This action was commenced on January 12, 1996, pursuant to § 2 of the Voting Rights Acts of 1965, 42 U.S.C. § 1973. Plaintiffs seek declaratory and injunctive relief against continued use of Montana House and Senate legislative districts established by the 1992 redistricting plan, adopted by Montana's 1990 Districting and Apportionment Commission and the Montana legislature following the 1990 federal decennial census.

Plaintiffs Earl Old Person and Carol Juneau are residents and voters of Glacier County, Montana, and reside on the Blackfeet Indian Reservation within House District 73 and Senate District 37. Plaintiffs Joe MacDonald and Jeannine Badilla are residents and voters of Lake County, Montana, and reside on the Flathead Indian Reservation within House District 85 and Senate District 43. All Plaintiffs are American Indians and tribal members.

The current Defendants are Bob Brown, Secretary of the State of Montana, and Judy Martz, Governor of Montana.

In their Amended Complaint filed February 15, 1996, Plaintiffs assert two claims.[1] First, Plaintiffs contend that Montana's 1992 redistricting plan dilutes Indian voting strength in Montana House Districts 73, 74, 85, 86, 91, 92, 97 and 98, which are located in areas which encompass the Blackfeet and Flathead Reservations and are situated in portions of Flathead, Lake, Glacier, and Pondera Counties, and claim that an additional majority Indian House District and majority Indian Senate District should be drawn for the Montana legislature. Plaintiffs further allege that Montana's redistricting was "enacted and maintained" with a racially discriminatory purpose.

On October 27, 1998, following a bench trial, the United States District Court for the District of Montana, Paul G. Hatfield, Judge, entered Judgment for Defendants on both of Plaintiffs' claims.

Exactly two years later, on October 27, 2000, the Ninth Circuit Court of Appeals affirmed the trial court's ruling that Plaintiffs had failed to prove that Montana's Districting and Apportionment Commission adopted the 1992 redistricting plan with a discriminatory purpose in violation of § 2 of the Voting Rights Act. However, the Court of Appeals held that the trial court had erred in two respects. First, the Court of Appeals found error in the trial court's reliance on the electoral success of American Indians in majority-Indian House Districts when it concluded that

white bloc voting in majority-white House Districts was not legally significant. Second, it found error in the trial court's finding with respect to "proportionality"— "the relation of the number of majority-Indian voting districts to the American Indians' share of the relevant population."[2] *Old Person v. Cooney,* 230 F.3d 1113, 1129 (9th Cir.2000). As a result, the Court of Appeals reversed the trial court's finding that Montana's 1992 redistricting plan did not dilute the voting strength of American Indians in violation of § 2. *Id.* at 1117.

The Court of Appeals remanded for retrial on the question of whether, in light of the totality of the circumstances, vote dilution had occurred; that is, whether under the 1992 redistricting plan, American Indians in the Montana House and Senate Districts at issue have " 'less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.' 42 U.S.C. § 1973(b); *see Johnson v. De Grandy,* 512 U.S. 997, 1013–14, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994)." *Old Person,* 230 F.3d at 1117.

On May 7, 2001, the undersigned was designated from the District of Nevada to perform the duties of a United States District Judge for the District of Montana for this specific case. Trial was conducted at Helena, Montana, on November 5–6, 2001, and post-trial briefing was completed on December 27, 2001. Based upon the evidence adduced at the trial on remand combined with the facts established in the original trial conducted in 1998, and affirmed by the Court of Appeals, the Court

---

1. The Amended Complaint filed February 15, 1996, presented claims on behalf of sixteen named Plaintiffs. Only four of the original Plaintiffs remain in the action on remand.

2. Earlier in its Opinion, the Court of Appeals characterizes the district court's second error

as the conclusion that under Montana's 1992 redistricting plan, American Indians were proportionally represented. *Old Person,* 230 F.3d at 1117. However, it appears from the balance of the Opinion that the second error actually assigned related to the trial court's finding of "proportionality." *Id.* at 1129–30.

makes the following Findings of Fact and Conclusions of Law.

### FACTUAL BACKGROUND

The trial court and Court of Appeals thoroughly articulated the process by which redistricting is accomplished decennially in the State of Montana:

> Since 1972, Montana's Constitution has granted the exclusive power to adopt a redistricting plan to a five-member Districting and Apportionment Commission. Although the Montana legislature can make recommendations to the Commission, it has no direct power over the geographic composition of legislative districts. The Commission itself is reconstituted every ten years in advance of the federal census. Commission members may not be public officials, although four of the five are appointed by a majority and minority leaders of each house of the state legislature. The four Commission members select the fifth member. The federal census in 1990 revealed that population changes in Montana between 1980 and 1990 had caused some legislative districts in Montana to become malapportioned, and potentially violative of the one-person one-vote requirement embodied in the Fourteenth Amendment. The 1992 Districting and Apportionment Commission therefore was required to draw a new redistricting plan. None of the five Commission members selected was an American Indian.
>
> The Commission held twelve regional public hearings beginning on April 3, 1992. Nine of these regional hearings were preceded by planning meetings that were open to the public. All of these hearings and meetings were recorded on audio tape; portions of these tapes were summarized or transcribed in the official minutes of the Commission. Statements made by Commissioners at these hearings and meetings form the basis for plaintiffs' claim that Commission members acted with a discriminatory purpose. American Indians appearing before the Commission presented alternative districting plans. One of these plans, referred to as the "Blackfeet–Flathead Plan," contained an alternative districting proposal for the four challenged House districts that are the subject of this appeal.
>
> After submitting its redistricting plan to the legislature for comment, the Commission filed its statewide redistricting plan with the Secretary of State on February 24, 1993. The plan (which we, like the district court, will continue to refer to as the "1992 redistricting plan") then became law, and the Commission dissolved.

*Old Person,* 230 F.3d at 1118.

In 1992, Montana's Districting and Apportionment Commission promulgated a redistricting plan increasing the number of majority-Indian House Districts from four to five. The 1992 redistricting plan contains one majority-Indian Senate District. Of the remaining House Districts in Montana, only four have an Indian voting age population of 11% or more. These four districts, H.D. 73, 74, 85 and 86, are the House Districts whose boundaries were challenged on appeal.[3] *Id.* at 1118–1119.

The Court of Appeals also affirmed the factual findings of the trial court on a variety of significant issues. American Indians comprise approximately 6% of the total population of Montana according to the 1990 Census. Montana's House of Representatives consists of 100 single-member districts with each member serv-

---

**3.** Plaintiffs did not appeal the trial court's findings of no vote dilution with respect to

Montana House Districts 91, 92, 97 and 98.

ing a two-year term. Montana's Senate consists of 50 single-member districts, with each member serving a four-year term. Under the redistricting plan adopted in 1982, American Indians comprised a majority of the voting age population in one of the 100 House Districts (in Glacier County). American Indians did not represent a majority of the voting age population in any of the 50 Senate Districts under the 1982 redistricting plan. By 1990, Montana's demographics had changed and American Indians comprised the majority of the voting age population in four of the one hundred House Districts and one of the 50 Senate Districts. *Id.* at 1117–1119.

## DISCUSSION

### A. Jurisdiction

This Court has subject matter jurisdiction over this voting rights action pursuant to 42 U.S.C. § 1973 and 28 U.S.C. §§ 1331, 1343(a)(3) and (4).

### B. Standing

The question of standing to sue is an important "threshold jurisdictional question." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). In voting rights cases, the United States Supreme Court has held that generally a plaintiff who resides outside the district at issue lacks standing to challenge the legislation that created that district "absent specific evidence that he personally has been subjected to a racial classification." *Shaw v. Hunt*, 517 U.S. 899, 903–904, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996) (analyzing an equal protection challenge to district boundaries). *See also Sinkfield v. Kelley*, 531 U.S. 28, 30–31, 121 S.Ct. 446, 148 L.Ed.2d 329 (2000) (analyzing an equal protection challenge to district boundaries).

■ In this case, Defendants insist that this Court must confine its "consideration of the evidence and its ruling" to the districts wherein the remaining Plaintiffs reside and thus have standing to sue under the Voting Rights Act of 1965, i.e., House Districts 73 and 85 and Senate Districts 37 and 43. In response, Plaintiffs do not suggest that they have standing to sue for relief in districts in which they do not reside, but maintain that Defendant confuses issues of jurisdiction with those relating to the relevance and admissibility of evidence with respect to election results in House Districts 74 and 86. Plaintiffs also argue that the Court of Appeals considered election results from House Districts 74 and 86 and urge this Court to continue to do so. *Old Person*, 230 F.3d at 1124–25.

The Court concludes that the four remaining Plaintiffs to this action only have standing to assert their vote dilution claims in the Montana House and Senate Districts in which they reside. *United States v. Hays*, 515 U.S. 737, 745, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995). As a result, any claim for relief entertained by this Court must be restricted to the House Districts 73 and 85 and Senate Districts 37 and 43. Nevertheless, the Court finds that evidence adduced at the trial on remand regarding the demographics and election results within House Districts 74 and 86 is relevant and admissible to the extent it informs the Court's totality of the circumstances analysis regarding Plaintiffs' vote dilution allegations as to House Districts 73 and 85 and Senate Districts 37 and 43.

### C. Vote Dilution

■ To establish a violation of § 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973, "[t]he American Indian plaintiffs must show 'that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by [American Indians, a "language minority group" protected by the Act under 42 U.S.C. § 1973aa–1a(e) ] in that [their] members have less

opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.'" *Old Person*, 230 F.3d at 1120.

■ The vote dilution inquiry under § 2 involves two steps. *Old Person*, 230 F.3d at 1120. First, Plaintiffs must show three threshold conditions exist—the *Gingles* factors. *Thornburg v. Gingles*, 478 U.S. 30, 50–51, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). Specifically, Plaintiffs must show (1) the population of American Indians is "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) American Indians are "politically cohesive" and (3) "the white majority votes sufficiently as a bloc to enable it in the absence of special circumstances ... usually to defeat the [American Indians'] preferred candidate." *Id.* Second, and only if the three *Gingles* factors are met, the "court must decide the ultimate question of vote dilution. In doing so the Court must determine whether, 'on the totality of circumstances,' American Indians have been denied an equal opportunity to 'participate in the political process and to elect representatives of their choice.'" *Old Person*, 230 F.3d at 1120 (citing 42 U.S.C. § 1973(b)).

In *Gingles*, the Supreme Court pointed to an exemplary list of factors that are important in any § 2 vote dilution inquiry. *Gingles*, 478 U.S. at 44–45, 106 S.Ct. 2752. The factors were taken from a list in the Senate Judiciary Committee majority Report that accompanied the bill amending the Voting Rights Act in 1982. *Id.* at 36, 106 S.Ct. 2752. The "Senate Factors" to which the *Gingles* Court refers are:

"1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process";

"2. the extent to which voting in the elections of the state or political subdivision is racially polarized";

"3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group";

"4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

"5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process";

"6. whether political campaigns have been characterized by overt or subtle racial appeals";

"7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

"Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are":

"[8.] whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

"[9.] whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous."

*Id.* at 36–37, 106 S.Ct. 2752 (quoting S.Rep. No. 97–417 at 28–29 (1982) *reprinted in* U.S.C.C.A.N. 177, 206–07).

After extensive analysis of the record before the trial court, the Court of Appeals found that the three *Gingles* factors were met, satisfying the first step of the vote dilution inquiry. *Old Person,* 230 F.3d at 1120–1128. The Court of Appeals ruled that the trial court had erred with respect to the third *Gingles* factor by finding that white bloc voting in majority-white House Districts was not legally significant, but the Court of Appeals, upon an examination of the evidence, held:

> Considering all this evidence in the aggregate, we conclude that the white majority in the four districts challenged on appeal 'vote sufficiently as a bloc to enable it...usually to defeat the [American Indians'] preferred candidate.' *Gingles,* 478 U.S. at 51, 106 S.Ct. 2752.

*Id.* at 1127.

Having determined that Plaintiffs' had satisfied all three *Gingles* factors, the Court of Appeals next addressed whether the trial court correctly analyzed the factors relevant to its decision that the 1992 redistricting plan did not impermissibly impair the ability of American Indians to elect their preferred representatives. The Court of Appeals concluded that the trial court erred with regard to the factor of proportionality. *Old Person* 230 F.3d at 1129.

The Court of Appeals cited two of the Senate factors as being particularly important to the totality of the circumstances inquiry—racial polarization (Senate factor two, "the extent to which voting in the elections of the state or political subdivision is racially polarized"), and proportional representation (Senate factor seven, "the extent to which American Indians have been elected to public office in the jurisdiction"). *Old Person,* 230 F.3d at

1128 (citing *Gingles,* 478 U.S. at 48 n. 15, 106 S.Ct. 2752). The Court of Appeals also noted a third important factor—that of proportionality ("the relation of the number of majority-Indian voting districts to the American Indians' share of the relevant population").[4] *Id.* at 1129 (citing *De Grandy,* 512 U.S. at 997, 1014 n. 11, 114 S.Ct. 2647). Because in weighing the totality of circumstances the trial court "recited several factors favoring each side," the Court of Appeals determined that "the case is sufficiently close that we cannot know whether or not the district court would have found dilution if it had correctly assessed the factor of proportionality." *Id.* at 1130.

The Court of Appeals has thus narrowly focused this Court's role on remand to "correctly assess the factor of proportionality" and to reconsider the totality of circumstances in determining whether vote dilution has occurred. *Old Person,* 230 F.3d at 1130.

**D. Law of the Case**

The initial inquiry by the trial court and Court of Appeals into the *Gingles* threshold factors has been decided and constitutes the law of the case which this Court is bound to follow on remand absent a showing of clear error or manifest injustice. *Arizona v. California,* 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983), *reh'g denied,* 462 U.S. 1146, 103 S.Ct. 3131, 77 L.Ed.2d 1381 (1983), *decision supplemented by,* 466 U.S. 144, 104 S.Ct. 1900, 80 L.Ed.2d 194 (1984) (citing sources). Since the original trial of this case in 1996, which provided the record for review by the Court of Appeals, the 1998 and 2000 elections have occurred in Montana and the 2000 federal decennial census has been

---

4. As explained by the Court of Appeals, "[p]roportionality is distinct from proportional representation. Proportionality relates to 'the political or electoral power of minority voters,' while proportional representation refers to the electoral success of minority candidates." *Old Person,* 230 F.3d at 1120 n. 5.

completed. To a degree these events are relevant to this Court's vote dilution inquiry; more particularly to the question of whether a viable remedy is available to correct the effect of any vote dilution pending the completion of the work of the 2000 Montana Districting and Apportionment Commission. Neither party, however, has argued that a reexamination of the *Gingles* factors is warranted in light of the Montana elections conducted in 1998 and 2000 or the 2000 census, nor do those events indicate that reexamination of the *Gingles* factors is necessary to avoid a "manifest injustice." *Arizona* at 618, n. 8, 103 S.Ct. 1382. This Court, therefore, assumes that the *Gingles* factors were met and that only the totality of circumstances inquiry should be re-evaluated in accord with the findings of the Court of Appeals.

## E. Proportionality

The Court of Appeals held that the trial court erred in its finding that the number of legislative districts in which American Indians constitute an effective majority[5] is "roughly proportional to the American Indians' respective share of the voting age population of Montana." *Old Person*, 230 F.3d at 1129–1130. In this regard, the Court of Appeals found that whether voting age population or total population was used as a measure of proportionality, there was arguably "rough proportionality" with respect to the House Districts, but not with respect to the Senate Districts, nor the Montana legislature as a whole. *Id.* at 1129–30. The 2000 census demonstrates that statewide, the gap between the number of majority-minority districts to minority members' share of the relevant population has increased in Montana. *De Grandy*, 512 U.S. at 997, 1014 n. 11. Indeed, the 2000 census reveals that American Indians now constitute 7.32% of the total population of Montana and 5.93%

of the voting age population, compared with 6% of the total population and 4.8% of the voting age population under the 1990 census which was the subject of the original record in this case. At the very outset of its analysis of the trial court's finding of proportionality, the Court of Appeals drew attention to a significant but unanswered question:

> The district court considered the question of proportionality within the entire state, and not within a geographic subset, for example the eight districts challenged at trial or certain counties within the state. Because the parties do not object to the scope of the district court's inquiry, we need not decide whether the entire state is the proper "frame of reference" for a proportionality finding. *De Grandy*, 512 U.S. at 1021 n. 18, 1022, 114 S.Ct. 2647, 512 U.S. 997, 114 S.Ct. 2647, 129 L.Ed.2d 775, *see also Rural West Tenn. African American–Affairs Council v. Sundquist*, 209 F.3d 835, 843–44 (6th Cir.), *cert. denied*, —— U.S. ——, 121 S.Ct. 340, 148 L.Ed.2d 273 (2000).

*Old Person*, 230 F.3d at 1130 n. 15.

The *Rural West* case cited by the Court of Appeals is particularly instructive on the issue of proportionality. *Rural West Tenn. African American–Affairs Council v. Sundquist*, 209 F.3d 835 (6th Cir.2000). In *Rural West*, plaintiffs residing in a rural region in western Tennessee challenged Tennessee's 1994 reapportionment of its legislative districts under § 2 of the Voting Rights Act of 1965. Affirming the trial court's finding that Tennessee's redistricting plan unlawfully diluted minority voting strength in rural western Tennessee, and noting the extreme lack of proportionality resulting from the fact that no African–American had been elected to the Tennessee legislature from the six-county

---

**5.** Under the 1992 redistricting plan, five of the one hundred Montana House Districts

(5%) and one of the fifty Senate Districts (2%) are majority Indian.

area at issue, the Sixth Circuit Court of Appeals focused extensively on the element of proportionality as explained by the United States Supreme Court in *De Grandy*, 512 U.S. at 997, 1024, 114 S.Ct. 2647 and *Shaw*, 517 U.S. at 899, 917, 116 S.Ct. 1894. *Rural West*, 209 F.3d at 842–844.

The *Rural West* court rejected Tennessee's argument that in evaluating proportionality, the trial court should have considered the entire state or an alternative area larger than the six rural counties in western Tennessee, maintaining that a statewide analysis would demonstrate substantial proportionality in favor of African-American representation. The Sixth Circuit Court of Appeals thereupon offered the following review of *De Grandy* and *Shaw*, the two leading cases from the United States Supreme Court on the issue of proportionality:

> In *Johnson v. De Grandy*, the Supreme Court explicitly left open the question of the proper frame of reference for analyzing § 2 claims. *De Grandy*, 512 U.S. at 1022, 114 S.Ct. 2647, 129 L.Ed.2d 775 ("[W]e have no occasion to decide which frame of reference should have been used if the parties had not apparently agreed in the District Court on the appropriate geographical scope for analyzing the alleged § 2 violation and devising its remedy."). Nevertheless, the reasoning in that case, and in *Shaw v. Hunt*, 517 U.S. 899, 917, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996), persuades us that neither over-proportionality in one area of the State nor substantial proportionality in the State as a whole should ordinarily be used to offset a problem of vote dilution in one discrete area of the State.
>
> In *De Grandy*, the State of Florida argued that, as a matter of law, no dilution occurs whenever the percentage of single-member districts in which minority voters form an effective majority mirrors the minority voters' percentage of

the relevant population. *De Grandy*, 512 U.S. at 1017, 114 S.Ct. 2647. Critiquing this "safe harbor" argument, the Supreme Court remarked on the State's "unexplored premise of highly suspect validity:"

> that in any given voting jurisdiction (or portion of that jurisdiction under consideration), the rights of some minority voters under § 2 may be traded off against the rights of other members of the same minority class. Under the State's view, the most blatant racial gerrymandering in half of a county's single-member districts would be irrelevant under § 2 if offset by political gerrymandering in the other half, so long as proportionality was the bottom line.

*Id.* at 1019, 116 S.Ct. 1894, 512 U.S. 997, 114 S.Ct. 2647, 129 L.Ed.2d 775. Similarly, in *Shaw*, the Court considered North Carolina's argument that a bizarrely shaped majority-black congressional district was a narrowly tailored remedy for a § 2 violation elsewhere in the State. *Shaw*, 517 U.S. at 916–17, 116 S.Ct. 1894. Finding this position "singularly unpersuasive," the Court states:

> If a § 2 violation is proved for a particular area, it flows from the fact that individuals in this area "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b). The vote-dilution injuries suffered by these persons are not remedied by creating a safe majority-black district somewhere else in the State....
>
> ...To accept that the district may be placed anywhere implies that the claim, and hence the coordinate right to an undiluted vote (to cast a ballot

equal among voters), belongs to the minority as a group and not to its individual members. It does not. *Id.* at 917, 517 U.S. 899, 116 S.Ct. 1894, 135 L.Ed.2d 207. Taken together, the admonitions of *De Grandy* and *Shaw* dissuade us from accepting Tennessee's invitation to append Shelby County, or the State as a whole, to the geographical frame of reference that the plaintiffs have selected because to do so would require us to trade the § 2 rights of individual African–Americans in rural west Tennessee against those of African–American groups elsewhere in the State.

The State complains that by allowing the plaintiffs to define the frame of reference for their § 2 claim, we will enable future litigants to carve up successively smaller areas of the State until they are able to maximize the number of majority-minority legislative districts—a result not countenanced by the Voting Rights Act. *See De Grandy,* 512 U.S. at 1017, 114 S.Ct. 2647, 129 L.Ed.2d 775 ("Failure to maximize cannot be the measure of § 2."). As the district court pointed out, however, the *Gingles* preconditions operate to prevent just the sort of limitlessly small "reverse gerrymander" whose specter the State raises here. *See, e.g., Campos v. City of Houston,* 113 F.3d 544, 547–48 (5th Cir.1997)(holding that minority group was not sufficiently large and geographically compact to sustain a § 2 claim). In this regard, we note that the region selected by the plaintiffs in this case is a sensible one—indeed, more sensible than the seven-county area including Shelby County urged by the State. While Shelby County is the southernmost and westernmost county in the State, and, like the six neighboring counties of rural west Tennessee, has a large African–American population, the seven counties do not form a coherent demographic unit. The African–American population in Shelby County is concentrated in inner-city Memphis, and is largely set off from rural west Tennessee by a "buffer zone" of white suburbs. As a result, the African–American populations in these two areas are not likely to be particularly cohesive. For this reason, the district court properly restricted the geographic scope of relevant statistical date to the six counties of rural west Tennessee. *Rural West,* 209 F.3d at 843–44.

◼ Reference to this extensive excerpt from *Rural West* is instructive because it demonstrates that the presence or absence of statewide proportionality in Montana cannot be determinative of the narrow vote dilution issue to be addressed by this Court on remand with respect to House Districts 73 and 85 and Senate Districts 37 and 43. As is so thoroughly discussed in *De Grandy,* the existence of statewide proportionality does not provide a safe harbor for "blatant racial gerrymandering" in portions of a legislative district. *De Grandy,* 512 U.S. at 1019. Conversely, the absence of proportionality on a statewide basis as is clearly evident in Montana, does not compel a conclusion of vote dilution in the particular House or Senate Districts at issue. A finding of vote dilution in each District at issue requires sufficient evidence that district-wide proportionality is lacking or other factual evidence of vote dilution actually exists in those Districts.

The record before the Court amply support the finding of the Court of Appeals that on a statewide basis, proportionality within the State of Montana is lacking. However, given that Indian-preferred candidates have been elected to the Montana legislature from both of the House Districts at issue and from one of the two Senate Districts at issue in this case, the Court concludes that if proportionality is evaluated within the relevant geographic

subset which this Court is called upon to assess on remand, the proportionality factor is satisfied. At a minimum, the question of whether proportionality should be assessed on a statewide basis or within the particular geographic subset before the Court for decision illustrates why the presence or absence or proportionality is not determinative on the issue of vote dilution but remains an additional factor which the Court should consider under the totality of circumstances. *Old Person,* 230 F.3d at 1130 n. 16. The Court therefore finds it appropriate to review the Senate factors previously addressed by the trial court and the Court of Appeals in light of the evidence and arguments presented by the parties with respect to the 1998 and 2000 Montana elections and the 2000 federal decennial census.

## F. Totality of Circumstances—the Senate Factors

### 1. History of Official Discrimination Affecting American Indians' Right to Vote

The trial court's prior determination that American Indians suffered from a history of discrimination by the federal government and the State of Montana was upheld by the Court of Appeals. Defendants argue that the "tide has turned" with respect to discrimination against American Indians. In this regard, Defendants cite the election of six American Indians to the Montana legislature in 2000, the appointment of one of the original Plaintiffs in this lawsuit, Janine Pease Pretty on Top, as Chair of the current Districting and Apportionment Commission, and the express Resolution of the 2000 Commission that it intends to create additional Indian-majority districts. Plaintiffs respond that because Ms. Pretty on Top was appointed, not elected, her position is less probative of the fact that discrimination against Indians has waned. Plaintiffs also argue that five of the six

Indians elected to the Montana legislature were from majority-Indian districts, which shows that majority Indian districts are "generally necessary for Indian voters to have an equal opportunity to elect candidates of their choice."

The Court finds that the record does reveal progress in reducing discrimination against American Indians in the State of Montana. However, as this particular Senate factor focuses on a prior history of discrimination and constitutes the law of the case based upon the record before the Court of Appeals in *Old Person,* this Court finds no basis to revisit the finding of the trial court as affirmed by the Court of Appeals.

### 2. Extent to Which Elections are Racially Polarized

The Court of Appeals upheld the trial court's prior finding that most of the elections in the challenged districts involving an American Indian and a white candidate were racially polarized. *Old Person,* 230 F.3d at 1129. Citing the expert testimony of Dr. Steven P. Cole based on bivariate ecological regression analysis ("BERA") and homogeneous precinct analysis, Plaintiffs argue there was racial polarization in the three Indian/white contests in 1998 and 2000. Plaintiffs also argue that Cole's BERA and homogeneous precinct analysis show racially polarized voting patterns for the four white/white contests in 1998 and 2000. Overall, Plaintiffs argue that eight out of nine legislative contests were polarized. Defendants argue that Dr. Cole's testimony is not credible, and that the use of the King methodology by Defendants' expert, Dr. Jeffrey Zax, was superior to Cole's analysis. This Court finds that the trial evidence demonstrates there was continued racial polarization as claimed by Plaintiffs in the 1998 and 2000 legislative contests evaluated by Drs. Cole and Zax.

### 3. Extent to Which the State Has Used Voting Practices or Procedures that May Enhance Discrimination Against American Indians

The Court of Appeals upheld the trial court's finding that "Montana does not have unreasonably large election districts, anti-single shot provisions, or other voting practices that enhance the opportunity for discrimination against Indian voters." *Old Person*, 230 F.3d at 1129. The parties have presented no new evidence on this factor.

### 4. Whether American Indians Have Been Denied Access to a Candidate Slating Process

The Court of Appeals noted that Montana does not have a candidate slating process. *Old Person*, 230 F.3d at 1129.

### 5. Extent to Which American Indians Bear the Effects of Discrimination in Areas Which Hinder Their Ability to Participate Effectively in the Political Process

The Court of Appeals upheld the trial court's finding that "American Indians have a lower socio-economic status than whites in Montana; these social and economic factors hinder the ability of American Indians in Montana to participate fully in the political process." *Old Person*, 230 F.3d at 1129. The parties have not presented new evidence with respect to this factor, and hence there is a notable lack of evidence that American Indians would fare any better in terms of their access to the political process if this Court were to order immediate district boundary changes.

### 6. Whether Political Campaigns Have Been Characterized by Overt or Subtle Racial Appeals

The Court of Appeals sustained the trial court's finding that "in at least two recent elections in Lake County, which is within the four districts challenged on appeal, there had been overt or subtle racial appeals." *Old Person*, 230 F.3d at 1129. The parties have presented no new evidence with respect to this factor.

### 7. Extent to Which American Indians Have Been Elected to Public Office

The trial court made extensive findings regarding the election of American Indians to public office in Montana in recent years. *Old Person v. Cooney*, No. 96–004 at 46–47 (D. Mont. filed Oct. 27, 1998). Although the Court of Appeals assigned error to the trial court's reliance in part on the electoral success of Indian candidates in majority-Indian House Districts when it concluded that white bloc voting in majority-white House Districts was not legally significant, *Old Person*, 230 F.3d at 1117, it did not otherwise disturb the trial court's findings with regard to which American Indians have been elected.

Plaintiffs argue that the election of Joey Jayne, a tribal member and the Indian-preferred candidate in HD 73 in the 2000 election, does not undermine a finding of legally significant white bloc voting. Plaintiffs claim that the election of Jayne was the result of a "special circumstances election" because Jayne had no opponent in the Democratic primary, and only a third party (Constitution Party) opponent in the general election. Regardless, Plaintiffs contend that the election of an American Indian does not weigh heavily in the "dilution equation." Finally, Plaintiffs argue that American Indians have not achieved proportional representation in Glacier, Pondera, Flathead, and Lake Counties because the percentage of representation calculated by Defendants in their Post–Trial Remand Brief is 10%, whereas the Indian percentage of the population is 13.49%. Defendants respond that Plaintiffs

offered no witnesses with any personal information about the Jayne–Jore race. Defendants argue that, because American Indians make up 13.49% of the total population of Glacier, Pondera, Flathead, and Lake Counties, and because two of the twenty legislators representing that area are American Indian, proportional representation of American Indians exists.

Nothing adduced at the trial on remand persuades the Court that the findings of the trial court regarding the extent to which American Indians have been elected to public office should be disturbed. Those election results as well as the 2000 election of Joey Jayne do not, as the Court of Appeals has held, support a conclusion that white bloc voting in majority-white House Districts is not legally significant. However, they do support this Court's finding that proportional representations of American Indians exist in the four legislative districts at issue in this case.

### 8. Elected Officials' Responsiveness to the Needs of American Indians

The Court of Appeals upheld the trial court's finding that Montana state officials are "generally responsive" to the needs of American Indians, though it noted that such responsiveness on the part of state officials "may be of 'limited relevance.'" *Old Person*, 230 F.3d at 1129 n. 14. The Court finds no basis in the evidence adduced at the trial on remand to disturb the trial court's earlier finding.

### 9. Whether the Policy Underlying the Use of the Voting Practice is Tenuous

The Court of Appeals upheld the trial court's finding that the "policies underlying the creation of the existing district boundaries were not tenuous." *Old Person*, 230 F.3d at 1129. The parties have presented no new information with respect to this factor.

### G. Proceedings before the 2000 Montana Districting and Apportionment Commission

On April 18, 2001, the 2000 Montana Districting and Apportionment Commission conducted its first public meeting (see Plaintiffs' Ex. 3) and on May 4, 2001, adopted Commission Resolution # 1 (see Defendant's Ex. 511–R, attachment 1). At the Commission meeting, Mike McGrath, Attorney General of Montana, made statements which Plaintiffs contend constitute an admission that Montana's 1992 redistricting plan violates § 2 of the Voting Rights Act as well as the view that Plaintiffs would ultimately prevail in the instant litigation. Plaintiffs also cite Attorney General McGrath's statement (that vote dilution of the Native American population in Montana and lack of proportionality will result in the creation of an additional Senate District in the Lake and Glacier County areas) as evidentiary support for Plaintiffs' claim of vote dilution in this case. More particularly, Plaintiffs cite to the following portion of Commission Resolution # 1 adopted May 4, 2001, as supporting their claim:

> ... The 2000 census data and the evidence of racial bloc voting and other factors regarding the dilution of Indian voting strength identified by the courts in *Old Person* support the creation of an additional majority Indian House district and an additional majority Indian Senate district in the region of Montana that is dealt with in *Old Person*, in recognition of the rights of Indians on the Blackfeet and Flathead Reservations under § 2 of the federal Voting Rights Act of 1965.

Defendant's Exhibit 511–R, Attachment 1 (expert report of Susan Byorth Fox). In addition, Plaintiffs note that the 2000 Montana Commission resolved to redistrict Montana's legislative districts:

... so that the political processes leading to the nomination or election to the Montana legislature are equally open to participation by Indians and so that Indians have an equal opportunity with other members of the electorate to participate in the political process and to elect legislators of their choice for the 2004 and subsequent legislative elections.

*Id.*

Defendants offer an array of evidentiary objections to admission of the foregoing statements attributed to Attorney General McGrath and the 2000 Montana Commission, including the argument that they constitute out-of-context and inadmissible hearsay by an attorney discussing settlement negotiations pertaining to the instant case and by a Commission which is not a party to this action.

The Court concludes that Plaintiffs' Exhibit 3 and Defendant's Exhibit 511–R should be received. To the extent they constitute hearsay declarations, the Exhibits are undeniably trustworthy and relevant to these proceedings on remand, at least insofar as they speak to the issue of the role of the 2000 Montana Commission in fashioning a viable remedy should vote dilution be found to have occurred within the Districts at issue. The Court finds they do not, however, constitute an admission of a Voting Rights Act violation with regard to the particular House and Senate Districts at issue in this case. Instead, they more broadly speak to the responsibilities of the 2000 Montana Districting and Apportionment Commission in redistricting the entire State of Montana pursuant to their Montana constitutional mandate.

**H. Conclusion Regarding Vote Dilution**

In addressing the foregoing factors, the trial court made the following finding which is undisturbed on appeal:

In applying these factors, the court must keep certain additional considerations in mind. First, the above-described list of relevant factors is exemplary, not exclusive. Second, there is no requirement that any particular number of factors be proved or that a majority of the factors point one way or another. Third, whether the political processes are equally open depends upon a searching practical evaluation of the past and present reality and upon a functional view of the political process. *Thornburg v. Gingles,* 478 U.S. 30, 46, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). 'In other words, scrutinizing electoral systems for Voting Rights Act violations is not an exact science.' *Askew v. City of Rome,* 127 F.3d 1355, 1379 (11th Cir.1997).

*Old Person v. Cooney,* No. 96–004 at 69 (D. Mont. filed Oct. 27, 1998).

On remand, this Court was not called upon to reconsider whether all three of the primary factors identified in *Gingles* were satisfied or whether statewide proportionality was lacking in Montana. The Court of Appeals has already assigned the errors in the trial court's findings and has made those determinations. This Court on remand is solely called upon to decide whether or to what extent the errors made by the trial court may have affected the ultimate finding that there was no dilution of American Indian voting strength. *Old Person,* 230 F.3d at 1131. This Court's focus is further narrowed, as it must be, to the House and Senate Districts in which the four remaining Plaintiffs reside and thus, have standing to sue.

█ Thus focused, this Court has re-examined the totality of the circumstances in light of the errors corrected by the Court of Appeals and as augmented by the evidence adduced at the trial on remand. The Court concludes that Plaintiffs have not met their burden of establishing vote

dilution in House Districts 73 and 85 and Senate Districts 37 and 43 under Montana's 1992 redistricting plan. Indeed, the fact that of the four districts at issue, both House Districts and one Senate District are already represented by Indian-preferred candidates strongly suggests that American Indians have an equal opportunity to elect candidates of their choice in the particular districts in which Plaintiffs in this action have standing to sue. This fact alone illustrates the success of American Indian candidates (proportional representation) and the electoral power of American Indian voters (proportionality) within the Districts at issue in this case. *De Grandy*, 512 U.S. at 1014 n. 11, 114 S.Ct. 2647. The totality of the remaining circumstances weigh in favor of the Court's finding that there is no vote dilution in the remaining Districts in controversy in this case.

## I. The Necessity of a Viable Remedy

Ordinarily, the Court's finding that Plaintiffs have failed to prove vote dilution in the Districts at issue would end the inquiry. Defendants, however, assert an additional argument that was apparently not raised before the Court of Appeals or in the original trial in this case: even if this Court were to find that vote dilution exists, it could not find a violation of § 2 of the Voting Rights Act unless it determined that a constitutionally acceptable remedy exists. The Ninth Circuit Court of Appeals has not addressed the issue of whether a viable remedy is an essential element of a § 2 claim. Defendants, however, cite the Court to *Nipper v. Smith*, 39 F.3d 1494 (11th Cir.1994) in which the Eleventh Circuit Court of Appeals has held that it is. While this Court is not bound to follow *Nipper,* the lengthy history of this litigation, including the proximity of the trial on remand to Montana's 2002 election, and the fact that Montana's Districting and Apportionment Commission is

in the midst of developing a redistricting plan based on the 2000 census, persuades the Court that it is here appropriate to address the arguments regarding remedy raised by the parties on remand.

Defendants argue that even if vote dilution is found to exist in this case, it is the result of population inequalities caused by naturally-occurring demographic changes in Montana over the past decade. In particular, Defendants cite the extensive population growth in western Montana, and the relatively smaller loss of population in certain counties in eastern and central Montana. Moreover, Defendants maintain that because Plaintiffs have not alleged an equal protection claim, they lack standing to seek an immediate redistricting of Lake and Glacier Counties based upon such naturally-occurring population inequalities. Defendants stress that disturbing existing districting boundaries would upset election machinery for the 2002 elections which is already in full swing. In particular, Defendants argue that such last-minute tampering with the current districting scheme would in many cases require voters to change precincts and polling places and that, given the rural nature of much of Montana, would create substantial difficulty and confusion for voters as well as potential candidates. Finally, Defendants insist that federal interference during an ongoing state election cycle is not warranted as long as Montana is proceeding in good faith to accomplish decennial redistricting though Montana's 2002 Districting and Apportionment Commission.

Plaintiffs do not specifically respond to Defendants' argument that the existence of a viable remedy is a necessary element for finding a violation of § 2 of the Voting Rights Act, but insist that they are entitled to an immediate and complete remedy where a violation of § 2 is found to exist. Moreover, Plaintiffs maintain that proposed redistricting plans for the areas at

issue in this case offered by Plaintiffs and Defendants demonstrate that existing malapportionment can be remedied in the areas of Lake County and Glacier County. In sum, Plaintiffs argue that Montana has a duty to reapportion in Lake and Glacier Counties to remedy any vote dilution that exists, and that if the state fails to do so, the Court should impose a redistricting remedy on the State of Montana.

The United States Supreme Court has made it clear that "legislative reapportionment is primarily a matter for legislative consideration and determination, and that judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so." *Reynolds v. Sims*, 377 U.S. 533, 586, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).[6] The Court in *Reynolds* did not delineate the proper remedial devices which federal courts should

utilize in state legislative apportionment cases. However, the Court did note that remedial techniques will "often differ with the circumstances of the challenged apportionment and a variety of local conditions." *Id.* at 585, 84 S.Ct. 1362. Recognizing that it would be an unusual case in which a court would be justified in not taking action to ensure that elections are not conducted under a malapportioned districting plan, the *Reynolds* Court stated:

> However, under certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case, even though the existing apportionment scheme was found invalid.

*Id.* at 585, 84 S.Ct. 1362.[7]

The uncontradicted evidence adduced at trial supports Defendants' argument that

---

**6.** Plaintiffs cite *Dickinson v. Indiana State Election Bd.*, 933 F.2d 497, 502 (7th Cir. 1991), for the proposition that "the supremacy clause ensures that the Voting Rights Act takes precedence over illegal state apportionments." Plaintiffs' quote from *Dickinson* is not complete, however. The full quote by the Court states: "But the supremacy clause ensures that the Voting Rights Act takes precedence over illegal state apportionments, and in light of the options available to accommodate the General Assembly's contribution, federalism provides no basis for dismissing the lawsuit." *Id.* at 502. The "options available to accommodate the General Assembly's contribution," to which the Court refers, include the option that "if a violation of the Voting Rights Act were found ... the General Assembly should be given the first opportunity to correct the deficiency through reapportionment." *Id.* at 501, n. 4. Other cases cited by Plaintiffs all refer to factual scenarios where the district courts ordered voting on a district level despite state law provisions that voting be at-large. (Post–Trial Reply at 27, citing *Rogers v. Lodge*, 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982), *Windy Boy v. County of Big Horn*, 647 F.Supp. 1002 (D.Mont. 1986), and *Cuthair v. Montezuma–Cortez, Col-*

*orado Sch. Dist.*, 7 F.Supp.2d 1152 (D.Col. 1998)). In contrast, this case concerns redistricting because of malapportionment.

**7.** In *French v. Boner*, a federal district court in Tennessee granted a motion for summary judgment against plaintiffs because there was no equal protection violation, though the districts were malapportioned. 786 F.Supp. 1328, 1333 (M.D.Tenn.1992), *aff'd by French v. Boner*, 963 F.2d 890 (6th Cir.), *cert. denied by French v. Metropolitan Gov. of Nashville and Davidson County, Tenn.*, 506 U.S. 954, 113 S.Ct. 411, 121 L.Ed.2d 335. The court noted that there was no dispute about malapportionment—the districting scheme which was in place as a result of the 1980 census resulted in malapportionment given the results of the 1990 census. *Id.* at 1329. However, the court stated "[t]he 'reasonably conceived plan' of decennial reapportionment is, of itself, sufficient to guarantee the constitutionality of the councilmanic elections held August 1, 1991." *Id.* at 1331 (citing *Reynolds*, 377 U.S. at 583, 84 S.Ct. 1362).

Similarly, in *Fairley v. Forrest County*, African American voters alleged violations of sections 2 and 5 of the Voting Rights Act, of the Fourteenth and Fifteenth Amendments of the

the 2002 Montana election cycle is in "full swing." Candidates for offices throughout the state begin announcing their candidacy in January 2002, and commence the process of contacting voters in their districts, compiling voter mailing lists and outlining campaign strategies. The deadline for Montana precinct changes is February 24, 2002, and the deadline for announcing candidacy is March 21, 2002. In preparation for those deadlines, the office of the Montana Secretary of State is in the midst of responding to questions about voter district boundaries and providing voter mailing lists to potential candidates. Testimony from the Deputy for Elections for the Montana Secretary of State establishes that one state referendum regarding the state deregulation of energy has already been qualified for the 2002 election. This means that the petition to place the referendum on the ballot has been signed and certified as representing 5% of the voters in 34 Montana House Districts. Changes in Montana House District boundaries, wherever they occur, would likely call into question this particular ballot measure.

The Court finds that potential candidates for office would be disadvantaged by any short-term change in district boundaries as they would not know which district they could run in, nor would they have timely access to voter registration information because the Montana county clerks and recorders would first have to redraw precinct boundaries and reassign precinct numbers to voters. Similarly, the ability of Montana voters in the redistricted areas to cast a vote would be impacted by changes in precincts and polling places which, according to the testimony adduced at trial, can pose a significant problem in the smaller and more rural counties of Montana.

The testimony and expert report of Susan Byorth Fox, legislative research analyst for the 2000 Montana Districting and Apportionment Commission, establishes that the Commission is in the midst of planning meetings. Indeed, the Commission has commenced a schedule of sixteen regional public hearings throughout the State to prepare a redistricting plan based upon the 2000 census which can be filed with the Secretary of State for consideration by Montana's legislature by January 2003 in accord with Montana's Constitution. *Mont. Const. Art. V, § 14(4)*.

The work of the Commission is a deliberative process and necessarily so. No attempt to correct malapportionment can ignore the fundamental "one person, one vote" goal announced by the United States Supreme Court in *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). Balancing the need for legislative independence and judicial review, the Supreme Court has held court-ordered reapportionment plans to a high standard of review:

> [U]nless there are persuasive justifications, a court-ordered reapportionment plan of a state legislature ... must ordinarily achieve the goal of population equality with little more than de minimis variation. Where important and significant state considerations rationally mandate departure from these standards, it

---

United States Constitution, and of the one-man, one-vote principle generally. 814 F.Supp. 1327 (S.D.Miss.1993). The Court denied the plaintiffs' request for a special election because of malapportionment in-between times of decennial redistricting:

> One election every 20 years (1971, 1991, 2001[sic], etc.) will be held so close to the taking of the decennial census that decision

makers acting in good faith may be unable to devise a constitutionally-acceptable reapportionment in time for the regularly scheduled elections. Does that mean that the Constitution requires the holding of special elections in every state in which this occurs once every 20 years? This Court thinks not.

*Id.* at 1343.

is the reapportioning court's responsibility to articulate precisely why a plan of single-member districts with minimal population variance cannot be adopted. *Chapman v. Meier*, 420 U.S. 1, 26–27, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975). *See also Connor v. Finch*, 431 U.S. 407, 414, 97 S.Ct. 1828, 52 L.Ed.2d 465 (1977) ("[I]n two important respects a court will be held to stricter standards in accomplishing its task than will a state legislature: '(U)nless there are persuasive justifications, a court-ordered reapportionment plan of a state legislature must avoid use of multimember districts, and, as well, must ordinarily achieve the goal of population equality with little more than de minimis variation.' *Chapman v. Meier*, 420 U.S. at 26–27, 95 S.Ct. at 766."). Any reapportionment plan ordered by this Court would need to follow the *Chapman* mandate, "achiev[ing] the goal of population equality with little more than de minimis variation." *Id.*

Notwithstanding Plaintiffs' arguments that a redistricting of the districts at issue can be achieved in accord with Plan E (submitted as Appendix 2a to Plaintiffs' Reply Memorandum filed December 27, 2001), Plaintiffs have failed to demonstrate that a court-ordered remedy to address alleged vote dilution would not violate the principals of "one person, one vote" throughout other legislative districts in Montana. That is precisely the task of the 2002 Montana Districting and Apportionment Commission and Montana legislature to be accomplished over the next twelve months. Legitimate state electoral policy which allows the Montana Districting and Apportionment Commission to accomplish its tasks every ten years in a comprehensive and coherent fashion is designed to preserve the orderly administration of elections and to encourage the highest possible participation by the electorate and potential candidates. Given the particular timing and demographic dynamics of Montana, any action by this Court to compel

partial redistricting would impair those legitimate state purposes.

Plaintiffs' reliance on the recent decision in *Alden v. Board of County Comm'rs*, CV 99–148–BLG–DWM (D. Mont. filed May 10, 2000) (Pls' Post–Trial Br., Ex. 3a), for the proposition that redistricting should not await the completion of Montana's 2002 redistricting plan is also misplaced. The situation in *Alden* is clearly distinguishable from the case now before the Court. Notably, in *Alden*, defendants stipulated to the fact that redistricting was appropriate. Their argument was limited to contesting the appropriate remedy instituted by the court based upon 1990 census figures, because the results of the 2000 census were not yet available. In ruling that short-term redistricting should be effected based upon 1990 census figures, the court reasoned that the defendants in *Alden* "had not produced any facts to indicate that the 1990 census is so inadequate that a remedy based on it is doomed to failure." *Id.* at 5.

The *Alden* action, however, was filed in 1999 to address proposed remedies for an election in 2002 for Rosebud County's conceded violation of § 2 of the Voting Rights Act. The court imposed a remedy with respect to Rosebud County Commissioner Districts based upon 10–year–old census figures from 1990. Here, by comparison, Plaintiffs brought this action in 1996 alleging § 2 violations based upon the 1992 Montana redistricting plan which was also based on the 1990 census. Here, the redistricting plan was adopted by the Montana legislature in 1993 and was in effect for less than four years when the suit was commenced. Moreover, there is no stipulation by the parties here, as there was in *Alden*, that redistricting is appropriate. Given the stipulation in *Alden*, the court was not required to consider separation of powers issues nor federalism concerns, nor did the *Alden* court have to confront the

**1020**

impact its redistricting order within Rosebud County would have through the balance of the State of Montana.

The Court concludes that without regard to whether the availability of a constitutionally acceptable remedy is deemed an essential element of a § 2 claim, given the particular circumstances of this case, it is an appropriate factor to be weighed in the § 2 totality of circumstances inquiry. Having done so, and for the reasons discussed above, the Court finds that this is the "unusual case" in which a viable short-term remedy is not available. The Court's conclusion in this regard is reinforced by the very real prospect that comprehensive and long-term relief designed to address vote dilution throughout the State of Montana is in the offing within a year under the auspices of the Montana Districting and Apportionment Commission, and further by the Court's finding that no vote dilution has been demonstrated in the particular legislative Districts at issue.

## CONCLUSION

Therefore, for the reasons set forth herein, the Court concludes that Judgment is appropriately entered in favor of Defendants with respect to Plaintiffs' § 2 voting rights claim remanded for further proceedings by the United States Court of Appeals for the Ninth Circuit.